# United States Court of Appeals
# for the Federal Circuit

NALCO COMPANY,

*Plaintiff –Appellant,*

*v.*

CHEM-MOD, LLC, ARTHUR J. GALLAGHER & CO., GALLAGHER CLEAN ENERGY, LLC., AJG COAL, INC., AJG IOWA REFINED COAL, LLC, MANSFIELD REFINED COAL LLC, COPE REFINED COAL LLC, CROSS REFINED COAL LLC, JEFFERIES REFINED COAL, LLC, JOPPA REFINED COAL, LLC, THOMAS HILL REFINED COAL LLC, WAGNER COALTECH LLC, WALTER SCOTT REFINED COAL LLC, WINYAH REFINED COAL LLC, BEDFORD MIX LLC, BRANDON SHORES COALTECH LLC, CANADYS REFINED COAL, LLC, CORONADO REFINED COAL LLC, FRM TRONA FUELS LLC, FRM VIRGINIA FUELS LLC, GEORGE NEAL NORTH REFINED COAL LLC, GEORGE NEAL REFINED COAL LLC, LOUISA REFINED COAL, LLC, REFINED FUELS OF ILLINOIS, LLC, BELLE RIVER FUELS COMPANY, LLC,

*Defendants – Appellees.*

*On Appeal from the U.S. District Court for the Northern District of Illinois, Eastern Division, in Case No. 1:14-cv-02510 Judge John W. Darrah*

## PLAINTIFF-APPELLANT NALCO COMPANY'S OPENING BRIEF

W. Bryan Farney
David Paul Swenson
Cassandra Klingman
FARNEY DANIELS PC
800 South Austin Avenue, Suite 200
Georgetown, Texas 78626
Telephone: (512) 582-2828
Facsimile: (512) 582-2829
BFarney@farneydaniels.com
DSwenson@farneydaniels.com
CKlingman@farneydaniels.com
*Counsel for Plaintiff-Appellant*

December 12, 2016

# CERTIFICATE OF INTEREST

1.    The full name of every party represented by me is:

Nalco Company.

2.    There are no other real parties in interest represented by me.

3.    Nalco Company is a wholly owned subsidiary of Ecolab USA, Inc., a publicly held company. No publicly held corporation owns 10% or more of Ecolab USA, Inc.

4.    The names of all the firms or lawyers that appeared for the party now represented by me in the trial court or are expected to appear in this court are as follows:

Bryan Farney, David P. Swenson, and Cassandra Klingman, Farney Daniels PC, 800 S. Austin Avenue, Suite 200, Georgetown, TX 78626;

Christopher K. Larus and Ari B. Lukoff, Robins Kaplan, 800 LaSalle Avenue, 2800 LaSalle Plaza, Minneapolis, MN 55402-2015

Bryan J. Vogel, Robins Kaplan LLP, 601 Lexington Avenue, Suite 3400, New York, NY 10022-4611

James T. Hultquist, Reed Smith LLP, 10 South Wacker Drive, Chicago, IL 60606-7507

Dated: December 12, 2016        /s/ *W. Bryan Farney*
                                         W. Bryan Farney

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ............................................................... i

STATEMENT OF RELATED CASES PER FED. CIR. R. 47.5 ...........................1

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES............................................................1

INTRODUCTION .................................................................................2

STATEMENT OF THE CASE................................................................4

I.  THE PARTIES ................................................................................4

II.  THE TECHNOLOGY AND DISPUTED CONSTRUCTION ......................6

    A.  Operation Of Coal-Fired Power Plants ................................6

    B.  The Process Claimed By The '692 Patent...........................9

    C.  The Chem-Mod Process ....................................................10

    D.  Review Of Disputed Claim Phrase ....................................14

    E.  The District Court's Erroneous Construction ....................18

    F.  Nalco's Claim Construction Position Is Supported By The Only Evidence Of Record ...................................................20

        1.  A POSITA Would Understand "Said Flue Gas" In Claim 1 Does Not Impose A Physical Location Limitation Excluding The Chem-Mod Process...........................................................21

            (a)  The Claim Language Supports Nalco's Construction Of "Flue Gas" ...................................................22

            (b)  The '692 Specification Supports Nalco's Position On "Flue Gas"...................................................24

            (c)  The '692 Patent File History Supports Nalco's Construction Of "Flue Gas" ...........................................25

            (d)  Technical Dictionaries Further Make Clear That Coal Combustion Flue Gas Is Broadly Understood To Be

The Gas That Is Created From The Combustion Of
Coal Wherever Located .................................................26

    (e)    Experts Agree That A POSITA Would Understand
"Said Flue Gas" To Mean The Gas Resulting From
Combustion Of The Coal, As Soon As It Is Created........26

    2.    A POSITA Would Understand "Injecting" In Claim 1 Does
Not Impose A Method Of Application Excluding The
Chem-Mod Process ..................................................29

SUMMARY OF THE ARGUMENT ....................................................34

STANDARD OF REVIEW .........................................................35

ARGUMENT ....................................................................36

I.    THE DISTRICT COURT ERRED AS A MATTER OF LAW IN
DECIDING THE 4AC DID NOT SATISFY THE PLEADING
REQUIREMENTS OF THE FEDERAL RULES........................................39

    A.    The District Court's Fundamental Error Was To Use Rule
12(b)(6) Improperly As A Means To Decide The Case On The
Merits, Instead Of Limiting The Rule To Its Proper Role Of
Testing The Sufficiency Of The Complaint........................39

    B.    The 4AC Unequivocally Contained Sufficient Allegations That,
If Properly Accepted As True, Adequately Plead A Claim Under
Rule 12(b)(6) .................................................41

        1.    Sufficient Allegations Regarding Claim Scope To State A
Claim Were Made In The 4AC..................................41

        2.    Sufficient Allegations Of Direct Infringement Were Made In
The 4AC ....................................................43

        3.    Nalco's Infringement Allegations Included More Than Basic
Pleading Allegations, But Also Detailed Infringement
Contentions Incorporated Into The 4AC......................44

        4.    Nalco's Allegations Plainly Were Sufficient..............45

    C.    Nalco's Direct Infringement Claim Satisfies Form 18 ........45

    D.    Even If Plausibility Is An Applicable Test For A Complaint That
Satisfies Form 18, The 4AC Allegations Plainly Are Plausible ........50

    E.    Fundamentally, The District Court's Dismissal Rests On A
Position As To Claim Scope That Was Reached Without The
Benefit Of Relevant Evidence, At The Rule 12(b)(6) Stage..............52

II.   EVEN ASSUMING, *ARGUENDO*, THAT THE DISMISSAL OF THE
      4AC WAS PROPER, IT WAS AN ABUSE OF DISCRETION TO
      MAKE THE DISMISSAL "WITH PREJUDICE" .......................................54

III.  THE DISTRICT COURT ALSO ERRED IN DENYING NALCO'S
      MOTION FOR RECONSIDERATION UNDER RULE 59(E) ...................58

IV.   THE ERROR OF THE DISTRICT COURT IN CONSTRUING THE
      CLAIMS ALSO INFECTED ITS DISMISSAL ON EQUIVALENTS,
      INDUCING AND CONTRIBUTORY INFRINGEMENT ISSUES............59

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ...............................60

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Annan v. Zaborowski*,
　2013 U.S. Dist. LEXIS 99456 (N.D. Ill. July 16, 2013) ...................................55

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009)........................................................................*passim*

*Barry Aviation, Inc. v. Land O'Lakes Municipal Airport Comm'n*,
　377 F.3d 682 (7th Cir. 2004) ...............................................................54

*Bd. of Trs. of Bay Med. Ctr. v. Humana Military Healthcare Servs.*,
　123 F. App'x 995 (Fed. Cir. 2005) .................................................35, 58

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007)........................................................................*passim*

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*,
　681 F.3d 1323 (Fed. Cir. 2012) .......................................................*passim*

*Brooks v. Ross*,
　578 F.3d 574 (7th Cir. 2009) ...............................................................40

*Bruce v. Guernsey*,
　777 F.3d 872 (7th Cir. 2015) ...............................................................36

*Cias, Inc. v. All. Gaming Corp.*,
　504 F.3d 1356 (Fed. Cir. 2007) ...........................................................38

*D-Beam v. Roller Derby Skate Corp.*,
　316 F. App'x 966 (Fed. Cir. 2008) .......................................................54

*Divane v. Krull Elec. Co., Inc.*,
　194 F.3d 845 (7th Cir. 1999) ...............................................................58

*Early v. Bankers Life & Casualty Co.*,
　959 F.2d 75 (7th Cir. 1992) .................................................................57

*Firestone Fin. Corp. v. Meyer*,
　796 F.3d 822 (7th Cir. 2015) .........................................................40, 41

*Foster v. DeLuca*,
  545 F.3d 582 (7th Cir. 2008) ........................................................54, 55

*Gharb v. Mitsubishi Elec. Automation, Inc.*,
  2012 U.S. Dist. LEXIS 76727 (N.D. Ill. June 4, 2012)......................48

*Gibson v. Chicago*,
  910 F.2d 1510 (7th Cir. 1990) .............................................................40

*Hahn v. Walsh*,
  762 F.3d 617 (7th Cir. 2014) ...............................................................36

*Hall v. Bed Bath & Beyond, Inc.*,
  705 F.3d 1357 (Fed. Cir. 2013) ...........................................................56

*Highsmith v. Chrysler Credit Corp.*,
  18 F.3d 434 (7th Cir. 1994) .................................................................57

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
  381 F.3d 1352 (Fed. Cir. 2004) ...........................................................24

*Indep. Trust Corp. v. Stewart Info. Servs. Corp.*,
  665 F.3d 930 (7th Cir. 2012) ...............................................................51

*K-Tech Telecomms., Inc. v. Time Warner Cable, Inc.*,
  714 F.3d 1277 (Fed. Cir. 2013) ...........................................37, 46, 50

*Lyda v. CBS Corp.*,
  2016 U.S. App. LEXIS 17694 (Fed. Cir. Sep. 30, 2016) .......45, 46, 50

*Masimo Corp. v. Mallinckrodt Inc.*,
  18 Fed. Appx. 852 (Fed. Cir. 2001).....................................................22

*Neitzke v. Williams*,
  490 U.S. 319 (1989).............................................................................51

*Orthmann v. Apple River Campground, Inc.*,
  757 F.2d 909 (7th Cir. 1985) ...............................................................57

*Oto v. Metropolitan Life Ins. Co.*,
  224 F.3d 601 (7th Cir. 2000) ...............................................................58

*Phillips v. AWH Corporation*,
 415 F.3d 1303 (Fed. Cir. 2005) ..................................................20, 21

*Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*,
 786 F.3d 510 (7th Cir. 2015) ...............................................................54

*Selective Ins. Co. v. City of Paris*,
 769 F.3d 501 (7th Cir. 2014) .......................................................36, 58

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
 135 S. Ct. 831 (2015)...........................................................................42

*UCB, Inc. v. Yeda Research & Dev. Co.*,
 837 F.3d 1256 (Fed. Cir. 2016) ........................................................43

*United States v. Ukranian Vill. Pharm., Inc.*,
 2013 U.S. Dist. LEXIS 159492 (N.D. Ill. Nov. 7, 2013) ...................55

*Wolf Run Hollow, LLC v. State Farm Bank, F.S.B.*,
 2013 U.S. Dist. LEXIS 167894 (N.D. Ill. Nov. 26, 2013) ...............48

## Statutes

28 U.S.C. § 1295(a)(1)................................................................................1

28 U.S.C. §§ 1331 and 1338(a)...................................................................1

## Other Authorities

FED. CIR. R. 47.5 .........................................................................................1

FED. R. APP. P. 4(a)(4)(A)(iv) ....................................................................1

FED. R. CIV. P. 8(a)(2)..................................................39, 40, 44, 45, 56

FED. R. CIV. P. 12(b)(6).....................................................................*passim*

FED. R. CIV. P. 59(e)..........................................................................*passim*

Stulz and Kitto, *Steam: Its Generation and Use 40th Edition*................26

## STATEMENT OF RELATED CASES PER FED. CIR. R. 47.5

Pursuant to Federal Circuit Rule 47.5, Appellant Nalco Company ("Appellant" or "Nalco") hereby describes the following related cases to this appeal. There are no related cases to this appeal.

## JURISDICTIONAL STATEMENT

This appeal is from the final decisions of the United States District Court for the Northern District of Illinois, which had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a). The court dismissed Nalco's Fourth Amended Complaint ("4AC") for patent infringement with prejudice, and subsequently separately denied Nalco's Motion for Reconsideration under Federal Rule of Civil Procedure 59(e). Appx1-10, Appx11-18. As both are final decisions, this Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1). Nalco timely appealed to this Court within thirty days of the court's denial of Nalco's Motion for Reconsideration, on October 12, 2016. *See* FED. R. APP. P. 4(a)(4)(A)(iv).

## STATEMENT OF THE ISSUES

1. Whether the court, in dismissing Nalco's 4AC under Rule 12(b)(6), erred as a matter of law in concluding the 4AC did not provide adequate notice of at least a single claim for which relief could be granted.

2. Whether, even if dismissal of the 4AC might be considered proper, it was an abuse of discretion to make that dismissal "with prejudice."

3.     Whether the court abused its discretion in denying Nalco's Motion for Reconsideration pursuant to Rule 59(e).

## **INTRODUCTION**

At its core, this case involves a straightforward claim construction dispute. Appellant-Plaintiff Nalco alleges that Appellee-Defendant Chem-Mod LLC's ("Chem-Mod") process infringes U.S. Patent No. 6,808,692 ("the '692 Patent"). Appx19-28.  Chem-Mod disputes this, contending an element of the asserted patent claims cannot be construed in a manner that would mean Chem-Mod's process infringes.  This Court, of course, sees such claim construction disputes routinely. The difference here is that the parties were not allowed to fully litigate the dispute. Instead, the district court decided the issue improperly, and erroneously, at the pleading stage by granting a motion to dismiss pursuant to Rule 12(b)(6).  The court did so without the benefit of a hearing on claim construction that allowed presentation of the relevant extrinsic and intrinsic evidence.

The case began with Nalco filing a complaint for patent infringement in the U.S. District Court for the Northern District of Illinois, against Chem-Mod and related parties. Appx41-45.  The original complaint was amended, and the First Amended Complaint ("1AC") subsequently was dismissed under Rule 12(b)(6) for failure to state a claim. Appx63-69, Appx490-496.  The fundamental basis of the court's decision was a disagreement with Nalco's positions regarding claim scope.

Although Nalco disagreed with the dismissal of the 1AC, it attempted to address the court's concerns, and proceeded to supplement its complaint.

In the Second Amended Complaint ("2AC"), Nalco went far beyond what is required to satisfy Rule 12(b)(6), and incorporated actual initial infringement contentions. Appx509-542. Subsequently, the 2AC was superseded by a Third Amended Complaint ("3AC"), with the only difference being the naming of certain parties in the 3AC that were unnamed in the 2AC. Appx1428-1471. The 3AC thus contained extensive supplementation of Nalco's contentions first provided in the 1AC. Nevertheless, the court again dismissed the 3AC under Rule 12(b)(6), citing the same claim construction grounds. Appx2091-2100.

Nalco then filed a Fourth Amended Complaint ("4AC"). Here again, despite disagreeing with the court's dismissal of the 3AC, Nalco supplemented even further its contentions as to infringement, as well as contentions regarding relevant claim constructions. Appx2101-2984. This effort also failed, as again, and this time with prejudice, the court dismissed the 4AC. Appx1-10. Nalco moved for reconsideration, and the court denied that motion as well. Appx3068-3086, Appx11-18.

As this Court will see in this brief, there can be no reasonable doubt that the 4AC adequately states a claim. It is well-established that the purpose of Rule 12(b)(6) is not to test the merits of the case, but instead only to test the sufficiency

of the complaint. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 573-76 (2007). At this stage, the question is not whether the plaintiff will prevail, but only whether the plaintiff is entitled to present evidence and proof to support its claims that have been set forth in the complaint, and whether the defendant has been provided reasonable notice of the plaintiff's claims. *Id.* at 555-56. Thus, in a Rule 12(b)(6) sufficiency analysis, the role of the district court is to determine if a cause of action is textually and legally sufficient, and not to prognosticate as to whether the plaintiff ultimately will prevail on the merits following discovery. The district court disregarded this standard, and decided the claim construction issue on the merits, without the benefit of the claim construction evidence – evidence that would establish that Nalco should prevail on the construction dispute.

Accordingly, the errors brought before this Court on appeal are that the district court first erred by concluding Nalco's 4AC did not state a claim under Rule 12(b)(6), then abused its discretion in making the dismissal with prejudice, and in denying Nalco's Motion for Reconsideration pursuant to Rule 59(e).

## STATEMENT OF THE CASE

### I.    THE PARTIES

Appellant Nalco Company is a leading provider of air protection technologies, and, in particular, technologies for removing hazardous mercury from flue gases resulting from the combustion of coal in coal-fired power plants.

Nalco's technologies deliver environmental, social and economic benefits to its customers. Nalco is the exclusive licensee of the '692 Patent, entitled "Enhanced Mercury Control in Coal-Fired Power Plants." Appx19-28. The '692 Patent was previously the subject of an Inter Partes Reexamination where the Patent and Trial Appeal Board ("PTAB") affirmed the validity of the asserted claims of the '692 Patent. Appx2371-2373. Nalco licensed the '692 Patent and developed the market for mercury removal technologies covered by the patent. These technologies have been adopted widely in the coal-fired power plant industry. Appx19-21.

Appellee Chem-Mod is a company created for the express purpose of facilitating the use by coal-fired power plants of the Nalco mercury-removal process. Appx2115-2120. Congress felt it was so important to encourage removal of the mercury resulting from coal combustion, that it established large tax credits for doing so. Appx2120-2121. Chem-Mod's business model is to provide the chemicals and instructions for carrying out the process to power plants, in return for the majority share of the tax credits that go to the respective power plants for implementing the mercury-reducing process. Appx2121-2126. The use of Chem-Mod's process employing the proprietary chemical products sold by Chem-Mod directly infringes the '692 Patent. The dispute between the parties on this point involves a straightforward issue of claim construction.

## II.  THE TECHNOLOGY AND DISPUTED CONSTRUCTION

To understand the claim construction dispute that will decide this case, it helps first to understand the underlying technology.  The invention of the '692 Patent is a major advance in environmental protection.  It permits the removal of mercury, a toxic pollutant, from the combustion flue gas from coal-fired power plants before that gas enters the atmosphere. Appx19-28.  Coal-fired power plants are a key part of the nation's electric power.  And although there is a debate about the future of such plants, for now they are a vital part of the nation's economy, and it is vital to make them as environmentally clean as they can be.  To that end, the '692 invention now is in wide use.  It is no exaggeration to say the invention has saved lives, and dramatically improved the quality of the nation's air.

### A.  Operation Of Coal-Fired Power Plants

To understand the invention, a brief overview of the operation of a coal-fired power plant is useful.  In a typical coal-fired power plant, there is a furnace where the coal is burned to produce heat; the heat from coal combustion is used to produce steam, which is then used to drive turbines to generate electricity. Appx5433-5434, Appx5428.  The area where the coal is burned is referred to as the combustion zone. Appx5244-5245.  The coal to be burned in a power plant is stored outside the furnace, and then pulverized, dried, and delivered by conveyor belt to the combustion zone of the furnace, where it typically is blown into the

combustion zone under air pressure using "coal injectors." Appx5434-5435. The

pulverized coal then combusts, providing the heat, which, in turn, creates steam to

drive the generators. Appx5435.

A simple example from an exhibit to Nalco's infringement contentions is

shown below:



Appx2852.[1]

An unusual aspect of describing the flow of flue gas in a power plant is the

concept of "upstream" and "downstream." Appx5237-5251. These terms are used

to refer to the direction of flow of the flue gas. Appx5237-5251. Thus,

---

[1] The figure is a portion of Appx2852, where a green oval has been removed for
clarity. It should be understood the exhibit is an over-simplified depiction. In an
actual power plant, the portion above the part denoted "Furnace" actually would
consist of generally horizontal passages including heat exchangers and pollution
filters through which the flue gas would pass before ultimately exiting out a
smokestack. Appx2435, Appx2560. Here, only the smokestack is shown without
these intermediate passageways, to simplify the depiction.

"downstream" refers to a direction further away from the furnace, and "upstream" refers to a direction closer to the furnace. It is important not to get confused by this terminology. Appx5237-5251. For example, in the simplified figure above, flue gas flowing "up" the smokestack from the furnace would correctly be referred to as flowing "downstream."

In operation, pulverized coal is injected using coal injectors into the combustion zone of the furnace, where the coal combusts and produces heat. When the coal combusts in this combustion zone, a gaseous byproduct is created. Appx5435, Appx5428. The industry refers to this gas resulting from coal combustion as "coal combustion flue gas" or, in more abbreviated form, simply as "flue gas." Appx5435, Appx5428. The '692 Patent uses the term "flue gas" in a manner consistent with the industry usage, to refer to the gaseous product of coal combustion.[2] The flue gas, created in the combustion zone, begins in the combustion zone and then travels downstream past heat exchange equipment, and pollution control filters, until it ultimately passes through the smokestack into the atmosphere. Appx5435, Appx5428. One of the toxic pollutants in that flue gas is elemental mercury. Appx5235-5236, Appx20-21. Removal of elemental mercury

---

[2] Thus, as one example, Claim 19 in the Reexam Certificate begins: "A method of treating flue gas that contains elemental mercury, **wherein the flue gas is produced during the combustion of coal**." Appx27 (emphasis added).

from the flue gas is not practically feasible by filtering, and other prior art methods were unsatisfactory. Appx20-21.

### B.   The Process Claimed By The '692 Patent

The invention of the '692 Patent addresses the problem that it is difficult to filter and remove elemental mercury found in flue gas. Appx20-21.  It was invented by Dr. Klaus Oehr, a scientist with over thirty years of experience in chemical and electrochemical research and development, and he is the inventor of numerous chemical products and processes. Appx19-20, Appx5235-5236.  Dr. Oehr, while working on the development of other pollution controls for flue gases, determined that molecular bromine ($Br_2$) will combine with elemental mercury to form mercuric bromide ($HgBr_2$), and that mercuric bromide will precipitate into particles that can be more easily filtered out of the flue gas. Appx20-21, Appx5236.  However, a problem is posed because molecular bromine itself is highly corrosive, and cannot practically be inserted into the flue gas on its own. Appx20-21, Appx5236.  Dr. Oehr's inventive process covered by the '692 Patent claims was instead to inject a bromine precursor (i.e., a molecule that reacts to create bromine) into the flue gas, where, in the heat of the flue gas, the precursor reacts to create molecular bromine, which then can combine with the elemental mercury in the flue gas to create mercuric bromide, a substance which readily can be filtered. Appx20-21, Appx5236.

A compound that breaks down, or changes, under heat, is referred to as "thermolabile," and thus the type of bromine precursor Dr. Oehr contemplated being part of his invention is referred to as "thermolabile." Appx5237, Appx5245. The innovative process of the '692 Patent thus involves the injection of a molecular bromine precursor, which is thermolabile at flue gas temperatures, into the flue gas so that it will react to create molecular bromine, and then combine with the elemental mercury in the flue gas to form mercuric bromide. The mercuric bromide then can be filtered successfully from the flue gas. This prevents the mercury from polluting the atmosphere. Appx20-21, Appx5236.

C.     **The Chem-Mod Process**

Chem-Mod's process is the same as the '692 Patent. It literally is encompassed by Claim 1. Chem-Mod's sole defense is that its process differs from the preferred embodiment of the '692 Patent, and that Claim 1 of the '692 Patent should be limited to cover only that preferred embodiment.

Chem-Mod's process can be described as follows. A molecular bromine precursor (which Chem-Mod calls "MerSorb") is mixed with pulverized coal outside the plant. Appx2116. This mixture is then injected into the combustion zone of the furnace which, as explained earlier, contains flue gas. Appx2115-2120.

MerSorb is comprised of calcium bromide and water. Appx2117, Appx2469. Thus, when the mix of MerSorb and pulverized coal is injected into the

10

combustion zone of the furnace containing flue gas, this step necessarily is the injection of calcium bromide – a bromide compound that is a thermolabile molecular bromine precursor – into the flue gas resulting from the combustion of coal in that combustion zone. Appx2115-2120. Quite simply, the Chem-Mod Process literally infringes Claim 1 of the '692 Patent on a verbatim basis.

Chem-Mod's entire defense rests on limiting Claim 1 to the preferred embodiment described in the '692 Patent. Appx2115-2120, Appx2115-2120, Appx2163-2177, Appx2179-2228. In that preferred embodiment, the bromine precursor specifically is injected directly into a region of the flow path of the flue gas downstream from the combustion zone. Appx19-28. The injected bromine precursor reacts to release molecular bromine to combine with the elemental mercury in the flue gas as previously described. Appx19-28.

The difference, then, between Chem-Mod's process and the preferred embodiment of the '692 Patent, is that Chem-Mod's process involves injecting the bromine precursor, mixed together with pulverized coal, into the flue gas in the combustion zone a little upstream from the region whereas instead, the '692 preferred embodiment proposes injecting the bromine precursor by itself, in a region Chem-Mod chooses to refer to as "the flue." Appx2115-2120, Appx2163-2177, Appx2179-2228. On this basis, Chem-Mod contended, and the district court concluded, that the Chem-Mod process differed from Claim 1 of the '692 Patent, in

both the "when" Chem-Mod applies its precursor and the "how" Chem-Mod applies its precursor. Appx5-7.

From the beginning, even in dismissing the 1AC, the court found the Chem-Mod process was not covered by the '692 Patent because the patent "involves injecting chemicals into flue gas after the coal has been burned, whereas the Chem-Mod Solution is a method that adds sorbents to coal when it is on the coal feed and before it is combusted." Appx494-495. The court never wavered in this view in its subsequent dismissals. Appx2094-2099, Appx5-8. In reaching this conclusion, the court was simply led astray by Chem-Mod into wrongly focusing on the point where Chem-Mod mixes its bromine precursor with the coal as if that were relevant to the "injecting" step in the '692 Patent claims. Nalco never claimed the point at which the Chem-Mod bromine precursor is mixed with coal is "injecting." The "injection" of the bromine precursor, along with the coal with which it is mixed, occurs at the next part of the Chem-Mod process, when they are injected together into the combustion zone via coal "injectors."

More specifically, the court concluded that Chem-Mod applies its precursor to the coal outside of the furnace, and then mixes the precursor and coal together before injecting them into the combustion zone. Appx5-7.

The district court concluded that because the precursor was applied to the coal outside the furnace, the precursor could not be found to be "injected" into the

flue gas. Appx5-7. Separately, the court concluded that because, in the Chem-Mod process, the bromine precursor and the pulverized coal are injected together into the combustion zone, that this materially differed from the requirement in Claim 1 of "how" the injection is to occur, which the court concluded required injecting a bromine precursor alone without any other substance. Appx5-7.

Although Chem-Mod's process has these technical differences with the preferred embodiment of the '692 Patent, these differences have no relevance to the question of infringement. Instead, the question of infringement here is framed by the following dispute: Chem-Mod contends the '692 Patent claims are limited to the preferred embodiment, and Nalco contends they are not. The court's error here was in resolving this claim construction dispute at the pleading stage, without the benefit of the claim construction evidence and argument.

As just one basic illustration of this point, it was explained above that the critical element of Dr. Oehr's invention was the addition of a thermolabile molecular bromine precursor to the gaseous product of coal combustion (i.e., "flue gas") for the purpose of creating bromine using the heat of the flue gas, which then combines with elemental mercury. Appx5236-5237, Appx19-28. Dr. Oehr's invention and the way it works are utterly indifferent to the location or nature of when the injection of the bromine cursor occurs. Appx5237-5238. Had the district court properly held a claim construction hearing, one piece of evidence it would

have heard was that the Chem-Mod process, which introduces the bromine precursor by mixing it with coal and then injecting the precursor and coal together into the combustion zone, is **the exact same method and location** for the introduction of the bromine precursor that Dr. Oehr used when he was developing his invention and conceiving of the '692 invention. Appx5237-5238. **Certainly this weighs against concluding the claim to Dr. Oehr's invention does not include the very process by which he made the invention**. And, this should come as no surprise, as Chem-Mod's own literature explains that its MerSorb product is specifically designed to perform Dr. Oehr's invention, which is to "react with the contaminant gases" (i.e., the coal combustion flue gas) and "are used to absorb toxic gases such as mercury ... that are emitted during the combustion of coal." Appx2167 (included as part of the 4AC).

With this background, it is useful to review the specific claim phrase in dispute: "injecting a bromide compound that is a thermolabile molecular bromine precursor into said [coal combustion] flue gas." Appx27-28.

### D. Review Of Disputed Claim Phrase

The claim construction dispute over this phrase can be illustrated with the following simple diagram of the coal-fired power plant, shown previously.



The patent claim defines "flue gas" as the gas resulting from the combustion of coal. Appx19-28. Such coal combustion gaseous byproduct is found, generally, in the area shown by red in the copy of the same figure below. Thus, Nalco's position is that the term "flue gas" refers to the coal combustion gas anywhere in the region marked by red.



In contrast, Chem-Mod, with no support in Nalco's 4AC (and indeed, directly contradicted by it), contends that the adjective "flue" in "flue gas" is a locational limitation. As such, Chem-Mod argues that "flue gas" refers to the coal

combustion gaseous byproduct only when it is located within an undefined area that Chem-Mod refers to as the "flue," by which Chem-Mod may mean generally the region marked in green in the figure below.



Thus, Chem-Mod's position is, nonsensically, that the gas emanating from the combustion of the coal is one type of gas until it travels to the green area, and upon passing an indeterminate threshold, becomes "flue gas," which can be treated by a bromine precursor, and then finally when it passes out of the green area is no longer "flue gas."

As previously noted, the preferred embodiment of the '692 Patent is described to be injecting the molecular bromine precursor into the flue gas downstream from the combustion zone, after an area of the furnace referred to as the superheater section. Appx19-28. Chem-Mod contends this region is the "flue." In contrast, in the Chem-Mod process, the molecular bromine precursor is first mixed with the pulverized coal, and then the precursor (along with the coal) is

injected into the portion of the area marked in red above, directly into the combustion zone. Appx2115-2120. In other words, the bromine precursor, and the pulverized coal injected with it, first contact flue gas when injected into the combustion zone where the coal is combusted, and the precursor breaks down to create molecular bromine in the flue gas resulting from the combustion of the coal. As noted, this latter approach was the same used by Dr. Oehr when he invented the '692 process, and it involves the same chemistry as claimed in the '692 Patent. Appx5237-5238.

Nalco's 4AC alleges the Chem-Mod process infringes on the basis of two alternative theories, both of which are supported by Claim 1. First, if the term "flue gas" is construed properly to be in the "red" region (as illustrated above), then it is clear that in the Chem-Mod process, the bromine precursor is injected into the flue gas, even if it is injected along with pulverized coal. Appx2115-2120. Second, and alternatively, even if, as Chem-Mod contends, one were to limit the "flue gas" to refer to the combustion gas only while it passes through the green region (as illustrated above), then Nalco contends the Chem-Mod process still would infringe because injecting the bromine precursor in the combustion zone still will cause the bromine precursor to flow downstream under pressure into the area even Chem-Mod concedes is the "flue," and the bromine precursor should still

be considered to be "injected" into the "flue gas" as properly construed. Appx2115-2120.

As is evident, the positions of the two parties present a straightforward claim construction dispute. Chem-Mod contends "flue" in "flue gas" imposes a locational limit on where the injection of bromide precursor may occur, and Chem-Mod argues that "injecting" must be construed in a way that prevents injection along with other substances at the same time, and also that "injecting" must be construed to prevent injecting such that the substance flows under pressure to a particular area. Conversely, Nalco contends "flue gas" means simply what the patent claim states – the gas resulting from combustion from coal, without regard to location. Appx19-28. And Nalco contends that "injecting" can be construed to cover the Chem-Mod process, under either construction of "flue gas." In sum, the case presents a straightforward claim construction dispute, which simply should not have been decided at the Rule 12(b)(6) stage.

### E.      The District Court's Erroneous Construction

Where the district court went awry was deciding this claim construction dispute, rather than simply assessing, as it should have, whether Nalco had stated a claim to which Chem-Mod could provide a defense. And, even considering the claim construction reached by the court, it erred in several ways. The court construed "flue gas" to mean the gas resulting from coal combustion only when

that gas was passing through an undefined, limited region somewhere downstream of the combustion zone, and not elsewhere.  And the court construed "injecting" to be limited to the first time the precursor is applied, even if this occurs when it is mixed with the coal outside the plant.  Thus, because Chem-Mod's molecular bromine precursor is mixed with coal outside the plant, the court concluded that this place where the "mixing" occurs must be where the precursor must be deemed "injected."  And, because that "injecting" step occurs "outside the plant," one cannot conclude the precursor is "injected into the flue gas." Appx5-7, Appx2094-2099.  This ignores both of Nalco's alternative positions.

First, even if one wanted to contend that applying and mixing the bromine precursor with the coal outside the plant comprised "injecting" the precursor, nothing in the claim precludes a subsequent "injecting" step to occur. Appx19-28.  And, nothing in the claim prevents the term "flue gas" to include the gas in the combustion zone, exactly as the patent claim defines it. Appx19-28.  Second, even if "flue" in "flue gas" imposed a locational limit, Nalco's second position that injecting the bromine precursor along with the coal into the region of the combustion zone still causes the molecular bromine precursor to flow up (i.e., "downstream") under pressure to the region Chem-Mod wishes to define as the "flue." Appx2115-2120.  Thus, in either case, Chem-Mod infringes.

Nalco pleaded both of these points in the 4AC, and even included

infringement contentions incorporated into the complaint demonstrating this. Appx2115-2120, Appx2802-2844. The only thing Nalco did not do, because under the law plainly it is not required to do so, was to plead all of the underlying supporting intrinsic and extrinsic evidence supporting its claim construction position. After the court dismissed the 4AC with prejudice, Nalco did provide that evidence to show that the dismissal "with prejudice" was in error, and that under Rule 59(e) the aspect of the dismissal making it "with prejudice" should be reversed. Appx3094-5437. This evidence, comprising both intrinsic and extrinsic evidence, is discussed below. The court's denial of that motion was an abuse of discretion, and is also the subject of appeal. But it is worth considering the submitted evidence, which the court would have heard had it properly allowed this case to proceed to a *Markman* hearing so claim construction could be decided on the merits. And it is worth noting that Chem-Mod never refuted this evidence, even though it had opportunity to do so. And the Court will see that this <u>unrefuted</u> evidence compels the conclusion that Nalco's claim construction position is not only plausible, but also is the correct claim construction under *Phillips v. AWH Corporation*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).

## F. Nalco's Claim Construction Position Is Supported By The Only Evidence Of Record

To make clear in its Motion for Reconsideration that it could in the future present a pleading that would state a claim for relief, and thereby demonstrate that

the dismissal "with prejudice" was incorrect, Nalco presented an abundance of intrinsic and extrinsic evidence. Appx3094-5437. This evidence demonstrated that a person having ordinary skill in the art ("POSITA") would understand the disputed claim terms in a manner consistent with Nalco's position.[3] Thus, a POSITA would understand that the term "said flue gas" in Claim 1 of the '692 Patent does not impose a physical location limitation excluding the Chem-Mod process. And, a POSITA would understand that the term "injecting" in Claim 1 does not impose a method of application limitation excluding the Chem-Mod process. This evidence is summarized below, and it is worth noting that Chem-Mod had the opportunity to refute it, and did not do so.

     1.    **A POSITA Would Understand "<u>Said Flue Gas</u>" In Claim 1 Does Not Impose A Physical Location Limitation Excluding The Chem-Mod Process**

The only evidence of record shows quite clearly that a POSITA would understand the term "flue gas" in Claim 1 to mean the gas created by the combustion of coal, as soon as that gas is created and that is present in the furnace itself, as well as "upstream." In other words, within the usage in the industry, the gaseous product of coal combustion is referred to as "flue gas" wherever it is located. It is not limited, as the district court erroneously found, to refer to that gas only when it passes through a limited region downstream.

---

[3] *See Phillips,* 415 F.3d at 1313.

### (a) The Claim Language Supports Nalco's Construction Of "Flue Gas"

As an initial matter, Claim 1 itself supports Nalco's view of how a POSITA would understand Claim 1. The actual phrase in the body of the claim is "said flue gas," where the term "said" is well understood in patent law to mean that the term that follows "said" has an antecedent basis.[4] Appx27-28. In Claim 1, the term "said flue gas" clearly refers to the earlier reference in the preamble of the claim to "coal combustion flue gas containing mercury." Appx27-28. Such "coal combustion flue gas containing mercury," referenced in the claim, is created and exists <u>in the furnace</u>, and it is <u>not limited to</u> a later area that the court apparently considered the "flue." Appx5246-5248, Appx5266-5316.

Other claims make this point as well. For example, Claim 21 provides: "A method of treating flue gas that contains elemental mercury, wherein the flue gas is produced during the combustion of coal." Appx28. Note that this language says the "flue gas" is "produced during the combustion of coal." It does not say, as the district court would have it, that "flue gas" is "the gas produced during the combustion of coal" <u>only while it is passing through a particular region downstream of the combustion zone</u>. The court's implicit construction wrongly added this last underlined phrase.

---

[4] *See, e.g.*, *Masimo Corp. v. Mallinckrodt Inc.*, 18 Fed. Appx. 852, 856 (Fed. Cir. 2001).

This point is well-illustrated by extrinsic evidence.[5]  For example, U.S. Patents Nos. 6,206,685 and 6,471,506 B1, claim methods for reducing nitrogen gases in "combustion flue gas." Appx5318-5359.  These patents expressly teach that "combustion flue gas" forms immediately upon the introduction of the coal with the metal additive into the combustion zone of the furnace. Appx5333.  Figure 1 of the '685 Patent illustrates this with "22" identifying the "combustion zone" and with each line labeled "34" representing "combustion" flue gas ... that flows in a downstream direction from combustion zone 22. Appx5320, Appx5332-5333:



These patents further teach that in the claimed methods for treating *combustion flue gas* "additives can be injected with the main fuel, in the main combustion zone" which includes "combustion flue gas 34." Appx5249,

---

[5] Multiple experts submitted declarations to establish that "coal combustion flue gas containing mercury" exists in the same area where the coal is combusting, and is present throughout the furnace. Their declarations are supported by other extrinsic evidence cited by them in their declarations. Appx5240-5437.

Appx5330-5331.   In other words, relevant prior art demonstrates that persons in the industry understood "flue gas" to refer to the combustion gas even in and around the combustion zone.

      **(b)**      **The '692 Specification Supports Nalco's Position On "Flue Gas"**

The specification certainly supports that Nalco's claim construction of "flue gas" is at least "possible."  Any argument that the invention is limited to causing the molecular bromine precursor to be introduced only in a physical area downstream of the combustion zone or the "stack" is dispelled by the statement in the specification summarizing the invention: "[a]ccording to the invention, there is provided a method of treating coal combustion flue gas, preferably that obtained after the 'superheater' section of a coal-fired plant." Appx21.  The use of the term "**<u>preferably</u>**" shows that the patent considers the treatment of coal combustion flue gas after it passes the "superheater" section as merely one possibility, and that the patent also contemplates that the flue gas can be treated elsewhere.[6]  As noted above, the PTAB, in affirming the validity of the claims currently in the '692 Patent, agreed with that position and recognized that the claims of the '692 Patent

---

[6] It is well understood that patent scope is not defined by the preferred embodiment, but instead by the claim language. *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1357-58 (Fed. Cir. 2004).

"**are silent as to either temperature or location of treatment of the flue gas.**"

Appx4910 (emphasis added).[7]

        **(c)**     **The '692 Patent File History Supports Nalco's Construction Of "Flue Gas"**

The intrinsic record also contains the various references cited on the face of the '692 Patent – including the Galbreath article. Appx4432-4453. The Galbreath article explains the process by which the coal combustion "flue gas" containing mercury at issue in the '692 Patent is created – and makes clear that the coal combustion flue gas is not limited to any particular location. Appx4432-4453. In the caption of Figure 1, it is made clear that flue gas is the gas that results from coal combustion. Appx4434 ("Potential mercury transformations during coal combustion and subsequently in the resulting flue gas."). Similarly, U.S. Patent No. 6,372,187 to Madden was part of the file history and is intrinsic evidence. Appx4476-4483. Madden teaches a "system for removing mercury from combustion flue gases." Appx4727. Specifically, it expressly teaches that "hot **flue gases** 42, containing contaminants such as mercury, **are generated in the**

---

[7] Chem-Mod made much of an out-of-context statement made by Nalco in the prosecution, contending it is contrary to Nalco's position. Appx3041-3045, Appx4508-4509. Nalco believes this statement is explained readily, and is not inconsistent. Appx5473. But, what is more clear, is that this is exactly the kind of issue which should have been litigated in the claim construction phase of the case, and not summarily disposed of without evidence and argument at the pleading stage.

**boiler 24 furnace** and rise through upper furnace region 28." Appx4732 (emphasis added).

>            (d)    **Technical Dictionaries Further Make Clear That Coal
>                   Combustion Flue Gas Is Broadly Understood To Be
>                   The Gas That Is Created From The Combustion Of
>                   Coal Wherever Located**

Consistent with the teaching of the intrinsic record, standard technical dictionaries also make clear that the term "flue gas" is defined broadly to mean simply the gaseous combustion products of a furnace. *See* McGraw-Hill Dic'y of Scientific & Technical Terms, 5th Edition, 1994, p. 779 (defining "flue gas" as "gaseous combustion products from a furnace"); Academic Press Dic'y of Science & Technology, 1992, p. 853 (defining "flue gas" as "the gaseous combustion products generated in a furnace"). Further, a well-known, widely used publication in the industry specifically explains that "flue gas" means "products of combustion." *See* Stulz and Kitto, *Steam: Its Generation and Use 40th Edition*, 1992, at 1-3. This evidence further demonstrates that coal combustion flue gas would be understood by a POSITA to mean the gas created by the combustion of coal.

>            (e)    **Experts Agree That A POSITA Would Understand
>                   "Said Flue Gas" To Mean The Gas Resulting From
>                   Combustion Of The Coal, As Soon As It Is Created**

Experts have also provided their opinion as to how a POSITA would understand the term "said flue gas" in Claim 1. One such expert is Dr. Andrew

Fry, a Professor of Chemical Engineering at the University of Utah who has spent

most of his career studying technologies relating to coal combustion, gasification

and power generation, including extensive study of various mercuric reduction

processes and technologies used within the coal-fired power plant industry.

Appx5241-5243. Consistent with the intrinsic and extrinsic evidence described

above, Dr. Fry explains that a POSITA would readily understand the '692 Patent's

use of the term "coal combustion flue gas" to mean the gas that is produced during

coal combustion; he also opines that this meaning is not limited to gases found in

any specific location of the furnace. Appx5245-5246. Further, Dr. Fry explains

that a POSITA would readily understand that such coal combustion flue gas exists

throughout the combustion zone of an operating coal combustion furnace or boiler

– the very location into which users of the accused Chem-Mod Solution inject a

mixture of calcium bromide and pulverized coal. Appx5245-5247.

Dr. Fry's testimony makes clear, with support from the "*Steam*" treatise

(Stulz and Kitto), that flue gas is present in the entire furnace area of an operating

coal-fired power plant. Appx5247-5248. Further, flue gas can be recirculated

back into the furnace – thus, flue gas does not lose its characterization as being

"flue gas" when it leaves a specific portion of the coal-fired power plant.

Appx5247-5248. Dr. Fry's testimony is corroborated by articles which describe

flue gas as being present throughout the gas stream path in a furnace. One article

is by Granite *et al.*, which describes flue gas as emerging from the furnace or combustion zone, and moving throughout various locations in the coal-fired power plant. Appx5249-5250, Appx5361-5410.

In addition, Nalco employees Dr. Bruce Keiser and John Meier are engineers with, at least, sufficient experience to opine as to the understanding of a POSITA. Each has provided a declaration supporting Nalco's position of how a POSITA would understand "said flue gas." Each opines that the term coal combustion "flue gas" as used in Claim 1 would be understood by a POSITA as the gas that is produced from coal combustion. Appx5429, Appx5435. Each further opines that a POSITA would understand that coal combustion flue gas is generated through coal combustion and is present throughout the combustion zone of an operating coal furnace or boiler. Appx5429; Appx5436. Dr. Oehr confirms these points, and also confirms he did not intend any narrower meaning of the term coal "flue gas" in his patent. Appx5237-5238.

It is thus clear by the *unrefuted* evidence presented by Nalco that it is at least a "possible construction" at the Rule 12(b)(6) stage that a POSITA would understand the term "said flue gas" in Claim 1 refers to the "coal combustion flue gas containing mercury" at any place it exists in the furnace or downstream in the stack, including in the combustion zone where it is created (and where the Chem-Mod process injects its additive).

## 2. A POSITA Would Understand "Injecting" In Claim 1 Does Not Impose A Method Of Application Excluding The Chem-Mod Process

As has been noted, the district court, in dismissing the 4AC, found Claim 1 to be different than the Chem-Mod process in "both the location and the method of application." Appx6. In addition to the court's implicit incorrect construction of the term "said flue gas," the court's conclusion was also based upon an implicit incorrect construction of "injecting" as used in Claim 1. Here again, however, intrinsic and extrinsic evidence establishes that it is at least plausible that the term "injecting" would be understood by a POSITA to have a meaning that encompasses the Chem-Mod process. At the Rule 12(b)(6) stage, this plausibility should have been sufficient to sustain the complaint.

**Indeed, Nalco's position that the '692 Patent claims encompass the Chem-Mod process is strongly supported by the dramatic fact that Dr. Oehr's early work on the '692 invention involved using exactly the Chem-Mod process of mixing the bromine precursor with pulverized coal and causing it to be introduced into the flue gas at the combustion zone**. Appx5238. And, in view of the following intrinsic and extrinsic evidence supporting the same claim construction, it is clear how a POSITA would understand the term "injecting" in Claim 1.

A POSITA would understand "injecting" to mean just what it is defined to mean in technology dictionaries and other relevant extrinsic evidence at the time. As an example, one commonly used dictionary defines "injecting" in this context to mean "the introduction of fuel, fuel and air, ... or other substance into [a] ... combustion chamber." McGraw-Hill Dic'y of Scientific & Technical Terms, Fifth Edition, 1994, p.779.

Dr. Fry similarly explains that a POSITA would understand that "injection" of a bromine precursor into "flue gas" occurs regardless of whether the compound being injected has been "mixed" with coal before injection. Appx5251-5252. He opines that a POSITA would not read the teachings of the '692 Patent to limit the claimed injecting step to a bromine precursor alone or excluding a mixture with coal. Appx5251-5252. Dr. Fry notes further that his opinion in this regard is supported and corroborated by numerous other patents relevant to the art of the '692 Patent that expressly teach the treatment of combustion flue gas through the injections of additives along with coal or other fuels. Appx5251-5252.

Strong extrinsic evidence also supports that a POSITA would understand the term "injecting" in this manner. For example, U.S. Pats. Nos. 6,206,685 and 6,471,506 B1, discussed above, explain in their claimed method for treating "combustion flue gas," that "additives can be **injected** with the main fuel, in the main combustion zone." Appx5330-5331 (emphasis added). Thus these patents, as

explained by Dr. Fry, support a conclusion that POSITA would understand the term "injecting" a bromine precursor into the flue gas to include mixing it with the fuel (i.e., the coal) and then injecting the additive with the fuel into the combustion zone that contains the flue gas, consistent with the earlier illustration from the intrinsic '685 Patent. Appx5249.

Dr. Fry and others also cite additional intrinsic evidence as support of a POSITA's understanding of "injecting." The Madden patent, for example, is highly instructive in this regard. Appx4476-4483. It is directed at an invention for removing mercury from the flue gas of coal-fired power plants. Appx4476. The patent explains how this is done: "[s]mall amounts of alkaline sorbents are thus injected into the flue gas stream at a relatively low rate." Appx4480. Elsewhere the patent explains the invention includes "the **injection** of any alkaline sorbent 14 **into a flue gas** 42, 44, 46 stream **anywhere from the boiler 24 to the exit stack 36**." Appx4481 (emphasis added).

Thus, the Madden patent uses virtually the same language as Claim 1 of the '692 Patent – an additive is "injected" into the "flue gas." And Madden makes it clear in using this term that it considers "injecting ... into flue gas" to be a term that includes introducing the additive mixed with fuel into the flue gas in the combustion zone, in addition to referring to introducing the additive into the flue gas at places downstream of the combustion zone. Madden thus demonstrates that

a POSITA would understand the term "injecting" in Claim 1 to be a term that encompasses adding it to the flue gas by injecting it: (a) with the fuel (i.e., coal) into the furnace; (b) by itself, downstream in the region of the '692 preferred embodiment; (c) or even somewhere later downstream. In Figure 2, cited below, Madden shows the alkaline sorbent being prepared in the box 12. Appx4478. It then shows that transmission of that sorbent along with the fuel into the furnace, transmission of the sorbent into the stack area near the boiler, and transmission of the sorbent at places downstream in the stack all are considered to be "injecting" the sorbent "into the flue gas." Appx4478.



Figure 2 shows by dotted line (highlighted yellow), that **each** of these places is considered by Madden to be "injecting" into the "flue gas," including doing exactly what Chem-Mod does, which is mixing the sorbent with the fuel 28 and injecting them together into the furnace 26. Appx4478. Experts confirm that

Madden demonstrates that a POSITA would understand "injecting" as used in Claim 1 to encompass Chem-Mod's process.

Further, Dr. Oehr also opines that he did not intend his invention to be limited to any specific mechanism or location at which injecting into flue gas must occur. Appx5238. Dr. Oehr's explanation of his initial conception of his claimed invention helps to demonstrate that an additive can be "inject[ed] ... into flue gas" even if "mixed" with coal before the injection occurs. Appx5238. Indeed, his initial work on his invention specifically involved mixing compounds with coal, and injecting the mixture into the furnace via coal injectors in the area of the combustion zone. Appx5238.

Dr. Keiser and John Meier, experts in the field, also have weighed in on this issue of how a POSITA would understand the term "injecting" in Claim 1. Both Dr. Keiser and Mr. Meier opine that a POSITA would understand readily that the injection of a mixture of an additive such as calcium bromide and pulverized coal into an operating furnace or boiler would constitute injection of those substances into flue gas. Appx5429-5430, Appx5436. Each also opine that a POSITA of the '692 Patent would be generally familiar with a variety of compounds used to treat various aspects of combustion flue gas that are injected into flue gas along with fuel through a coal injector or burner. Appx5430, Appx5436.

In short, the intrinsic and extrinsic evidence, plus the related expert and

inventor testimony, collectively demonstrate that a POSITA would understand

"injecting" as used in Claim 1 to include the process employed by Chem-Mod.[8]

Given that the intrinsic and extrinsic evidence supports Nalco's

constructions of "injecting" and of "flue gas," such that the Chem-Mod process

infringes the '692 Patent, it was error for the court to implicitly construe the claim

in several erroneous limiting ways, to ignore allegations in the 4AC to the contrary,

and to dismiss the 4AC with prejudice.

## SUMMARY OF THE ARGUMENT

The district court erred first, and principally, in dismissing Nalco's Fourth

Amended Complaint for failure to state a claim pursuant to Rule 12(b)(6). The

court based its conclusion upon an improper, and erroneous, implicit claim

construction of one element of Claim 1 of the '692 Patent. The court erred in

making this finding by failing to apply the Federal Rules' liberal notice pleading

standards properly, by failing to accept the allegations in the 4AC as true, by

conducting an improper claim construction at the Rule 12(b)(6) stage, and by

ignoring Form 18 and other relevant pleading standards.

---

[8] This is true whether "injecting" is construed to mean inserting the additive under pressure to contact the flue gas at a specific location, or more broadly construed simply to require "introducing" the additive into the system in one area lacking flue gas, in a manner that it flows to "flue gas" in another area. Under either definition, when the mixture of calcium bromide and coal is injected into the combustion zone of the furnace via coal injectors, a POSITA would understand it has been "injected" into the flue gas whether the gas is considered to be in the combustion zone itself, or instead downstream of the zone.

Second, the district court abused its discretion in dismissing Nalco's 4AC "with prejudice," rather than "without prejudice." The court erred in reaching this finding without analyzing the futility standard, and failing to justify the dismissal with prejudice by finding that it was "certain" that Nalco could not in the future present a pleading that would state a claim for relief.

Finally, the court abused its discretion in denying Nalco's Motion for Reconsideration, by failing to acknowledge that it made a manifest error of law in disregarding and neglecting to apply the futility standard before opining that the dismissal of the 4AC should be "with prejudice."

When it is understood that the court's dismissal based upon claim construction should be reversed, it is clear that the dismissal by the court of other claims on that ground – direct literal infringement, infringement under the doctrine of equivalents, inducement of infringement, and contributory infringement – also should be reversed.

## STANDARD OF REVIEW

This Court reviews a district court's dismissal for failure to state a claim, and a denial of a motion for reconsideration, under the law of the regional circuit. *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1331 (Fed. Cir. 2012); *Bd. of Trs. of Bay Med. Ctr. v. Humana Military Healthcare Servs.,* 123 F. App'x 995, 996 (Fed. Cir. 2005). The Seventh Circuit reviews a

district court's dismissal for failure to state a claim under Rule 12(b)(6) *de novo*, and the decision to make that dismissal "with prejudice" under an abuse of discretion standard. *Bruce v. Guernsey*, 777 F.3d 872, 875 (7th Cir. 2015); *Hahn v. Walsh*, 762 F.3d 617, 628 (7th Cir. 2014). A ruling on a motion for reconsideration also is reviewed under an abuse of discretion standard. *Selective Ins. Co. v. City of Paris,* 769 F.3d 501, 507 (7th Cir. 2014).

## ARGUMENT

The district court dismissed the 4AC with prejudice because it accepted Chem-Mod's claim construction arguments. As explained in the Background, the key dispute in this case is over the proper construction of the phrase "injecting … into said flue gas" as used in Claim 1, where the parties dispute the construction of "flue gas" and "injecting."

Nalco's position is that "flue gas" refers to the gas resulting from the combustion of the coal in the furnace, wherever it may be located. Chem-Mod, instead, contends that "coal combustion flue gas" refers only to the gas resulting from coal combustion when that gas is in a region of the furnace that Chem-Mod wishes to refer to as the "flue."

There can be no doubt that Nalco pleaded its position in the 4AC, and that this position is plausible. Even Chem-Mod concedes that the PTAB specifically held that Claim 1's reference to "flue gas" did not limit the process to applying

only in a region Chem-Mod would term "the flue." Appx3041-3045, Appx4508-4509, Appx5473.

Further, the 4AC included actual evidence supporting Nalco's position. The file history of the '692 Patent included the Madden reference as prior art.[9] As explained in the Background, Madden includes a diagram of a power plant, and identifies "flue gas" as being omnipresent, both in the combustion zone and downstream. Appx4476-4483, Appx4727-4732. Thus, Madden strongly supports Nalco's position. In contrast, Chem-Mod has never cited a single piece of evidence to the contrary, except for one citation to a statement whose import the parties' dispute.[10] Given just the PTAB decision, and the Madden reference, and even ignoring the evidence later cited by Nalco in its Rule 59(e) motion, it is evident that Nalco's position on "flue gas" is plausible, and thus satisfies Rule 12(b)(6).

Apart from its erroneous construction of "flue gas," the court also erred in rejecting Nalco's allegations that, **even if** a court were to construe "flue gas" to be limited to a particular location, the Chem-Mod process still infringes because injecting a molecular bromine precursor into the combustion zone will result in that precursor flowing under pressure into the alleged "flue" area. Appx2116-2119.

---

[9] Cited prior art is part of the public record that can be considered under Rule 12(b)(6). *K-Tech Telecomms., Inc. v. Time Warner Cable, Inc*., 714 F.3d 1277, 1282 (Fed. Cir. 2013).

[10] *See* n.7, *supra*.

The court's rejection of this position involved both an improper claim construction, and a misunderstanding of patent law.

The first problem with this is that the court accepted Chem-Mod's position that the only place in Chem-Mod's process that must be considered, in deciding whether "injecting" occurs for purposes of the '692 Patent, is where the bromine precursor is mixed with the coal outside of the power plant. Because that mixing step occurs outside the furnace, and is not done in the presence of flue gas, the court concluded Chem-Mod could not infringe. The problem with this analysis is, quite simply, that Nalco never alleged that the step of mixing the bromine precursor with the coal outside the plant is a step that satisfies the claims. Further, even if one were to label that process "injecting," which Nalco does not presently assert, nothing bars Nalco from asserting, as it does in the 4AC, that the subsequent injection of the precursor mixed with the coal into the combustion zone is also "injecting." Indeed, it is noteworthy that the way in which Chem-Mod's mixture is introduced into the combustion zone is, by Chem-Mod's own admission, is the use of "coal **injectors**."Appx2117 (4AC ¶29), Appx3012 (emphasis added).

The second problem is that the court found the Chem-Mod process could not infringe Claim 1 because the precursor is injected along with coal. But Claim 1 does not require that "only" the precursor be injected. *See, e.g.*, *Cias, Inc. v. All. Gaming Corp*., 504 F.3d 1356 (Fed. Cir. 2007) ("In the patent claim context the

term 'comprising' is well understood to mean 'including but not limited to.'"").

Nalco included this specific allegation in the 4AC. Appx2114-2115.

Given this, the district court plainly erred. Rule 12(b)(6) is neither the forum

to conduct claim construction, nor to decide the case on the merits. It is only to

test the sufficiency of the complaint. And, a review of the 4AC shows that the

4AC more than satisfies the sufficiency test.

Accordingly, a *de novo* review by this Court plainly will show that the 4AC

more than adequately states a claim for which relief can be granted, and as such

satisfies Rule 12(b)(6). The dismissal, then, should be reversed.


I.     **THE DISTRICT COURT ERRED AS A MATTER OF LAW IN
       DECIDING THE 4AC DID NOT SATISFY THE PLEADING
       REQUIREMENTS OF THE FEDERAL RULES**

       A.     **The District Court's Fundamental Error Was To Use Rule
              12(b)(6) Improperly As A Means To Decide The Case On The
              Merits, Instead Of Limiting The Rule To Its Proper Role Of
              Testing The Sufficiency Of The Complaint**

       The Federal Rules are well-understood to establish a "notice pleading"

system. *Twombly*, 550 U.S. at 555. Rule 8 sets forth the basic premise: the

complaint must provide "a short and plain statement of the claim showing that the

pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). In *Twombly*, and later in

*Iqbal*, the Supreme Court added clarification to Rule 8, providing that to be

sufficient, the claims made in a complaint must be plausible. *See Ashcroft v. Iqbal,*

556 U.S. 662, 678 (2009). But neither *Twombly* nor *Iqbal* contradict the basic principle that the requirement of Rule 8 is one of "fair notice" of the claim and the basis for it. *Twombly,* 550 U.S. at 555. Rule 8, does "not impose a probability requirement on plaintiffs." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (citing *Twombly*, 550 U.S. at 556). Instead, "a well-pleaded complaint may proceed even if it is strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely." *Id*.

This principle is captured well by the following pronouncement by the Seventh Circuit: the "purpose of a [Rule 12(b)(6)] motion to dismiss is to **test the sufficiency** of the complaint, **not to decide the merits**." *Gibson v. Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990) (emphasis added). All that is required is "'enough facts to raise a reasonable expectation that discovery will reveal evidence' supporting the plaintiff's allegations." *Brooks,* 578 F.3d at 581 citing *Twombly*, 550 U.S. at 556.

A corollary principle, well-established, and very relevant here, is that in assessing the sufficiency of the complaint, a court must accept the plaintiff's allegations as true. *Id.* at 555-56; *Iqbal,* 556 U.S. at 678. *See also In re Bill of Lading*, 681 F.3d at 1331. Here, the district court cited this principle, but plainly did not follow it in practice. Instead, like the court in *Firestone,* the court here erroneously assessed whether or not the allegations in the 4AC were true, rather

than accepting them as true. *See Firestone Fin. Corp. v. Meyer,* 796 F.3d 822, 827

(7th Cir. 2015) (citing *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570))

("The relevant question under these cases is *not* whether a complaint's factual

allegations are true, but rather whether the complaint 'contain[s] sufficient factual

matter, *accepted as true*, to "state a claim to relief that is plausible on its face."'")

(emphasis in original).

Given that the district court erred in deciding the case on the merits, rather

than merely confirming the sufficiency of the complaint, if the 4AC sufficiently

alleges infringement, then the court committed reversible error. Nalco now turns

to showing that the 4AC certainly sufficiently alleged infringement.

**B.    The 4AC Unequivocally Contained Sufficient Allegations That, If Properly Accepted As True, Adequately Plead A Claim Under Rule 12(b)(6)**

A simple review of the 4AC demonstrates that the district court cannot be

fairly considered to have accepted Nalco's many allegations as true. Had those

allegations been accepted as true, as they should have been, it would have been

undeniable that the 4AC sufficiently states a claim for infringement. To

demonstrate this certainty, Nalco provides below examples from the 4AC.

**1.    Sufficient Allegations Regarding Claim Scope To State A Claim Were Made In The 4AC**

The legally sufficient allegations made by Nalco in the 4AC include

**allegations concerning the scope of the claims of the '692 Patent**:

¶ 18: "The claims of the '692 Patent do not restrict when the step of 'injecting a bromide compound…into said [coal combustion] flue gas'…must be performed."

¶ 19: "[T]he claims of the '692 Patent do not restrict whether the step of 'injecting a bromide compound…into said [coal combustion] flue gas"…be performed by injecting only a thermolabile molecular bromine precursor, or injecting a thermolabile molecular bromine precursor in combination with other compounds."

¶ 20: "[T]he claims of the '692 Patent do not restrict the specific mechanism by which or location within the coal-fired power plant at which the claimed 'injecting' must occur."

¶ 21: "As explained in the '692 Patent, 'coal combustion flue gas' is the gas that is created during the combustion of coal.

Appx2114-2117.

If any of these allegations of claim scope had been accepted as true, which they should have been, it is clear Nalco adequately pled a case for infringement. Here, Chem-Mod contends that Nalco's allegation in ¶21 is a legal allegation that can be ignored by the court, citing *AmTab Mfg. Corp. v. SICO Inc.,* 2012 U.S. Dist. LEXIS 45549, at *3 (N.D. Ill. Mar. 29, 2012) ("Claim construction is a question of law."), and *Ashcroft,* 556 U.S. at 663 (citing *Twombly,* 550 U.S. at 555 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.")). Appx2998-2999.   But Chem-Mod's position flatly is wrong.  This Court well knows that claim construction ultimately is a question of law, but it rests on underlying question of facts involving reference to intrinsic evidence and extrinsic evidence. *See Teva Pharms. USA, Inc. v.*

*Sandoz, Inc.,* 135 S. Ct. 831, 838 (2015); *UCB, Inc. v. Yeda Research & Dev. Co*., 837 F.3d 1256, 1259 (Fed. Cir. 2016) ("Claim construction is a matter of law, based on underlying facts").  Thus, Nalco's claim scope allegations inherently embodied factual allegations, and those inherent factual allegations should have been accepted as true.

### 2. Sufficient Allegations Of Direct Infringement Were Made In The 4AC

Separate and apart from claim scope allegations, in the 4AC Nalco also made **<u>multiple direct allegations of infringement</u>** that were more than sufficient. These included:

> ¶ 26: "The Chem-Mod Solution involves the step of 'injecting a bromide compound…into said flue gas' as recited in claim 1 of the '692 Patent."

> ¶ 27: "The Chem-Mod Solution Mixture is then injected into coal combustion flue gas to effect oxidation of elemental mercury into a mercuric bromide."

> ¶ 29: "When a coal combustion furnace is operating, the coal component of the Chem-Mod Solution Mixture combusts to create coal combustion flue gas. This coal combustion flue gas is present throughout the operating coal combustion furnace, including the site at which the Chem-Mod Solution Mixture is injected via coal injectors into the operating coal-fired power plant"

> *See also* ¶¶ 30-39 (further describing how the Chem-Mod Solution and its application meet Claim 1 of the '692 Patent and infringes either directly, or, alternatively, under the doctrine of equivalents).

Appx2115-2120.

Here again, these allegations plainly are sufficient, if accepted as true, to provide notice of Nalco's claim under Rule 8, and are sufficient to state a claim for which relief can be granted under Rule 12(b)(6).

### 3. Nalco's Infringement Allegations Included More Than Basic Pleading Allegations, But Also Detailed Infringement Contentions Incorporated Into The 4AC

The district court's decision that the 4AC failed to state a claim also ignores that Nalco actually went far beyond any requirement of the pleading standards, and included and incorporated by reference actual infringement contentions. Appx2802-2844. Thus, the 4AC must also have been understood to have pled a case for infringement as to Claim 1, **in the form of infringement contentions**.

This Court can review those forty pages of contentions, which were included and incorporated into the 4AC, to see that Nalco alleged a sufficient case of infringement in great detail. Appx2802-2844. No reasonable person can review those detailed infringement contentions and find that Nalco has not at least provided notice of its claim for infringement, given fair notice of its position, and stated allegations that, if properly accepted as true, establish a case for infringement.[11]

---

[11] That Nalco's contentions were sufficient to give Chem-Mod notice is demonstrated by the fact that Chem-Mod was able to respond with detailed invalidity and non-infringement contentions of its own, contentions which highlighted that this case resolves to claim construction disputes. Appx5483-5525.

#### 4. Nalco's Allegations Plainly Were Sufficient

If any of Nalco's claim construction contentions, infringement contentions in the body of the 4AC, or detailed infringement contentions incorporated into the 4AC had been accepted as true, it would have been clear that Nalco satisfied the standards of Rule 8 and 12(b)(6).

Chem-Mod argued they should not be accepted as true because they were contrary to a proper construction of "injecting" and "flue gas." Appx2995-3000. But, this only highlights that Chem-Mod's motion, and the court's granting of that motion, rested on an erroneous judgment as to the merits of the claim construction issues underlying this case, rather than the question of the sufficiency of the complaint. There is no doubt the 4AC, had the allegations been accepted as true as they should have been, was sufficient.

### C. Nalco's Direct Infringement Claim Satisfies Form 18

Considering any applicable standard, the 4AC allegations are sufficient. First, Chem-Mod does not dispute that the allegations satisfy Form 18. This Court has held that a pleading that satisfies Form 18 as to claims of direct patent infringement must be found sufficient to survive a motion to dismiss, holding when it is satisfied, "Form 18 'effectively immunizes a claimant from attack regarding the sufficiency of the pleading.'" *See, e.g., Lyda v. CBS Corp.*, 2016 U.S. App. LEXIS 17694, at *11 (Fed. Cir. Sep. 30, 2016), citing *K-Tech Telecomms.,*

*Inc.*, 714 F.3d at 1283.[12] "[T]o the extent any conflict exists between *Twombly* (and its progeny) and the Forms regarding pleadings requirements, the Forms control." *Id.* at *11-12 citing *K-Tech,* 714 F.3d at 1283. And when a pleading of direct infringement follows Form 18, such as the one presented by Nalco, it "cannot be successfully attacked [pursuant to Rule 12(b)(6)]." *See id.* Finally, it is clear that "Form 18 includes no indication that a patent holder must prospectively anticipate [defendant's] noninfringement arguments." *K-Tech*, 714 F.3d at 1284.

Nalco raised Form 18 repeatedly below, and the court ignored this basis for not dismissing the complaint. In the 4AC dismissal decision, the court *did not even mention* Form 18 other than to list it under the legal standard section of its opinion. Appx5. However, in briefing to dismiss the 1AC, Form 18 was addressed – mainly by the parties, but only briefly by the court. There, even as to 1AC, which included less detailed pleading than later provided in the 4AC, Chem-Mod did not dispute the 1AC satisfied Form 18 (and, thus by definition, does not dispute that the 4AC satisfies Form 18). Appx260-264.

The table below makes it clear that the 4AC complied with Form 18:

| **Form 18's Elements for Pleading Direct Infringement:** | **Example Allegation in the 4AC Meeting Form 18:** |
|---|---|
| (1) An allegation of jurisdiction: | ¶¶ 12-15 of the 4AC. |

---

[12] While Form 18 was eliminated from the Federal Rules effective December 1, 2015, this repeal does not apply to this case because it was commenced prior to that date. *See Lyda*, 2016 U.S. App. LEXIS 17694 at *10-11 n.2.

| (2) A statement that the plaintiff owns the patent. | ¶¶ 2 and 4-6 of the 4AC. |
|---|---|
| (3) A statement that the Defendant has been and is infringing the patent. | ¶¶ 3, 22, 32, 62-107, 113, 121, 129, 137, and 145. |
| (4) A statement that the plaintiff has given the Defendant notice of patent infringement; and | ¶¶ 3, 108-111 and the Filing of the Original Complaint. |
| (5) A demand for damages. | P. 58, A-I of the 4AC. |

Chem-Mod does not dispute the 4AC satisfies Form 18. Instead, Chem-Mod argues that Form 18 is "irrelevant" because "[w]hether or not Nalco could have stated a claim by pleading less, it chose to plead more – and what it chose to plead belies any claim of infringement." Appx259. The court agreed. Appx494-495 ("Nalco's own allegations and attached exhibits contradict that the Chem-Mod Solution directly infringes the method patent found in the '692 Patent").

Chem-Mod's argument, then, is that even though the 4AC satisfies Form 18, this does not matter because inclusion of details about Chem-Mod's process makes the infringement allegation "implausible" because of the claim construction disputes over "flue gas" and "injecting" terms previously discussed. The court agreed.

The court's conclusion that a pleading satisfying Form 18 can be undercut by adding detail rests on citations to a few district court cases cited by Chem-Mod, only one of which even mentions Form 18. Appx260-262. The premise of those

cases is that there can be circumstances where a plaintiff first adequately pleads a case, but then provides more information that demonstrates those allegations cannot be true.

One case cited by Chem-Mod purportedly supporting its argument was *Wolf Run Hollow, LLC v. State Farm Bank, F.S.B.*, 2013 U.S. Dist. LEXIS 167894, at *3 (N.D. Ill. Nov. 26, 2013), where the court dismissed a complaint showing data encrypted by software already on sender's computer, instead of by "software transmitted to the sender by the recipient," as required by patent. In other words, the plaintiff pled general allegations that were contradicted by included exhibits, and moreover, in *Wolf*, the plaintiff had conceded a key claim term was not satisfied by the accused system. *Id.*[13] In *Gharb v. Mitsubishi Elec. Automation, Inc.*, 2012 U.S. Dist. LEXIS 76727, at *7-8, 20 (N.D. Ill. June 4, 2012), similarly, the plaintiff pled general allegations of infringement that a security system infringed, but then included information that showed all that was accused was a circuit that would only make up part of an infringing product. *Id.*

Both of these cases are distinguishable. In each, added detail contradicted, or failed to support, earlier general allegations. In contrast, here, by the time of the 4AC, the complaint contained not only general allegations of infringement, but specific allegations of infringement. These allegations were consistent with, and

---

[13] Tellingly, the plaintiff in *Wolf Run* was permitted to amend its complaint to allege further facts, assumed to be true, to permit an inference of infringement.

not contradicted by the added information in the incorporated infringement contentions. Here, nothing in the 4AC contradicts the allegations of infringement, or demonstrates any form of implausibility. <u>Instead, what Chem-Mod points to is that Nalco has included sufficient information to identify the claim construction dispute that will be the key to this litigation. That Chem-Mod believes that claim construction should be decided in its favor, does not make the case implausible.</u> Were that true, every defendant with a defense could argue a plaintiff's case was implausible.

Even the Seventh Circuit case cited by Chem-Mod illustrates this point. Chem-Mod relied upon the following quotation from the Seventh Circuit *Bogie v. Rosenberg* decision as supporting its position that a Form 18-satisfying complaint can be undermined by additional information.

> When an exhibit contradicts the allegations in the complaint, ruling against the non-moving party on a motion to dismiss is consistent with our obligation to review all facts in the light most favorable to the nonmoving party. ... That is not to say that a plaintiff cannot contradict the apparent meaning or significance of a document or other exhibit. ... *But a plaintiff whose case relies on contradicting such an attachment needs to explain her position.*

*Bogie*, 705 F.3d 603, 609 (7th Cir. 2013) (emphasis added by Chem-Mod).

Simply reading this quotation shows it does not apply here. First, the detailed allegations in the 4AC are consistent with the included exhibits, and do not contradict them. Moreover, the Seventh Circuit, in the last part of the

49

quotation, makes it clear that even if there appears to be an inconsistency, the plaintiff can explain how that is not the case.

Here, Nalco acted consistently with *Bogie*. In the less detailed 1AC, Nalco alleged infringement. Chem-Mod argued that the included exhibits showing how its process worked meant that Claim 1 could not be satisfied, and thus "contradicted" the allegation of infringement. Appx260-263. In response, consistent with *Bogie*, by the time of the 4AC, Nalco had incorporated numerous detailed allegations showing how it alleged every element of Claim 1 was met, and included supporting exhibits that did not contradict Nalco's position. In short, Nalco's 4AC overwhelmingly satisfied the notice requirement of Form 18, and nothing it said elsewhere contradicted its position, nor made it implausible.

**D.** **Even If Plausibility Is An Applicable Test For A Complaint That Satisfies Form 18, The 4AC Allegations Plainly Are Plausible**

Given that the 4AC satisfies Form 18, it is not clear that plausibility under *Twombly/Iqbal* even need be considered.[14] But, even assuming plausibility is a relevant criterion here, the 4AC allegations plainly satisfy it. The plausibility standard "'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence' supporting the plaintiff's allegations." *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570). And "a plaintiff's claim need not

---

[14] *See Lyda*, 2016 U.S. App. LEXIS 17694 at *11. *But compare K-Tech,* 714 F.3d at 1287-89 (J. Wallach, concurring).

be probable, only plausible: 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Indep. Trust Corp. v. Stewart Info. Servs. Corp.,* 665 F.3d 930, 935 (7th Cir. 2012) (citing *Twombly,* 550 U.S. at 556). *See also Twombly,* 550 U.S. at 555 (a court must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)"); *Neitzke v. Williams,* 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations ... .").

Here, Nalco presented sufficient factual allegations to raise a reasonable expectation that discovery will reveal evidence supporting its claims, and even included preliminary infringement contentions supporting its position.[15]  Indeed, in doing so, Nalco went far beyond the minimum requirements of Rule 12(b)(6), particularly where this Court has held that "the Federal Rules of Civil Procedure do not require a plaintiff to plead fact establishing that each element of an asserted claim is met." *In re Bill of Lading*, 681 F.3d at 1335.  The court's improper implicit claim construction at the Rule 12(b)(6) stage does not change this result.

---

[15] Chem-Mod also has contended that, even if Nalco's position on claim scope was accepted, it still could not assert an act of infringement. Appx5456.  But this is also inaccurate.  Nalco certainly pled in the 4AC that Chem-Mod's direct control and direction carrying out the process in the University of North Dakota facility constituted literal infringement. Appx2126-2144, Appx3085-3086.  And, with respect to this activity, Chem-Mod has not denied that the 4AC adequately pled an act of infringement, with the sole exception of the claim scope issue.

Moreover, in the Rule 59(e) motion, Nalco provided a great volume of evidence, which Chem-Mod chose not to refute. This evidence strongly supports Nalco's claim construction positions, as was explained in detail in the Background Section. In summary, they include: declarations from the inventor and multiple experts in the field; the patent itself and its file history; other patents that claim methods for reducing nitrogen gases in "combustion flue gas"; dictionary definitions of relevant claim terms; and articles explaining the process by which the coal combustion "flue gas" containing mercury at issue in the '692 Patent is created. All supported Nalco's 4AC allegations regarding "flue gas" and "injecting," and certainly demonstrated Nalco's position was at least "plausible."

## E.   Fundamentally, The District Court's Dismissal Rests On A Position As To Claim Scope That Was Reached Without The Benefit Of Relevant Evidence, At The Rule 12(b)(6) Stage

The district court could not have found that Nalco's 4AC allegations were implausible without first finding that Nalco's position as to the meaning of "flue gas" and of "injecting" were implausible. The court could only reach this decision by engaging in an improper claim construction.

This Court made clear in *Bill of Lading* that where the infringement allegations rest on deciding a claim construction issue, that issue is not to be decided at the Rule 12(b)(6) stage. Instead, the plaintiff is to be accorded the

broadest possible construction in assessing the sufficiency and plausibility of the alleged infringement. *In re Bill of Lading*, 681 F.3d at 1343, n.13.

In *Bill of Lading*, this Court considered a dismissal of several counts of infringement, including contributory and inducement. As to contributory, the plaintiff alleged contributory infringement, but included within its complaint exhibits showing the accused products undoubtedly had noninfringing uses. *Id.* at 1337-39. This Court on that basis upheld the dismissal of the contributory infringement claims. *Id.*

In contrast, with inducement, the district court dismissed because the conduct induced would not meet the claim as the court understood the scope of the claim terms. *Id.* at 1339-43. But whether this was correct required construing the claim, and the plaintiff asserted a claim construction position that would encompass the induced activity. *Id.* On this point, this Court held differently, holding that, where the issue resolves to one of claim construction, Rule 12(b)(6) is not the proper stage at which to decide the case. *Id.* For this reason, the Court admonished in this context that the plaintiff must be afforded <u>the broadest possible construction</u>. *Id.*at 1343, n.13.

The district court's decision in the present case emphatically did not follow *Bill of Lading*. Nalco asserted a plausible construction of "flue gas" that would result in infringement. Nalco also asserted a plausible case for "injecting" that

would result in infringement, even if it lost on the issue of proper construction of "flue gas." Had the court followed *Bill of Lading*, and afforded Nalco the broadest possible construction, it would have accorded Nalco these constructions, under which Nalco plainly adequately alleged infringement.

## II. EVEN ASSUMING, *ARGUENDO*, THAT THE DISMISSAL OF THE 4AC WAS PROPER, IT WAS AN ABUSE OF DISCRETION TO MAKE THE DISMISSAL "WITH PREJUDICE"

Even assuming, *arguendo*, that dismissal of the 4AC for failure to state a claim for relief was proper (which it was not, as explained above), at a minimum, the district court's determination that the dismissal be "with prejudice" should be reversed. This is so because a dismissal "with prejudice" is an extreme sanction, and should only be used in instances where it is "certain" that any future pleading would be futile. *See, e.g., D-Beam v. Roller Derby Skate Corp.*, 316 F. App'x 966, 969 (Fed. Cir. 2008) (dismissal with prejudice was only appropriate because any further amendment would be futile); *Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.,* 786 F.3d 510, 519-520 (7th Cir. 2015) (similar); *accord, Barry Aviation, Inc. v. Land O'Lakes Municipal Airport Comm'n,* 377 F.3d 682, 687 (7th Cir. 2004); *Foster v. DeLuca*, 545 F.3d 582, 583 (7th Cir. 2008).

The court's dismissal with prejudice did not acknowledge this standard, or provide an explanation why dismissal with prejudice was appropriate, other than to

point out that Nalco has filed several amended complaints in this case.[16] Appx10. But the number of complaints that have been filed in a case does not dictate the analysis of whether a dismissal "with prejudice" is appropriate under Seventh Circuit law. *See, e.g., United States v. Ukranian Vill. Pharm., Inc.,* 2013 U.S. Dist. LEXIS 159492, *20-21 (N.D. Ill. Nov. 7, 2013) (allowing four previous amendments and only dismissing with prejudice once it was determined that any further amendments would be futile); *Annan v. Zaborowski,* 2013 U.S. Dist. LEXIS 99456, at *4 (N.D. Ill. July 16, 2013) (similar).

In order to justify dismissing this case with prejudice, there needed to be a finding that Nalco could not in the future present an amended complaint that stated a claim for relief. There was no such finding by the district court, nor could there be, as Nalco demonstrated in its Rule 59(e) motion. Appx3068-3086.

Essentially, what happened here was that Nalco twice attempted to add more detail about its contentions after the court dismissed complaints based upon improper grounds involving claim construction. In briefing on each, Nalco maintained its correct position that it did not have to incorporate all of its *Markman* evidence and arguments on claim construction into a complaint for patent

---

[16] Evidence that dismissals with prejudice are greatly disfavored in the Seventh Circuit is the requirement that dismissals with prejudice that fail to provide any explanation or findings that such an extreme sanction is warranted be reversed. *See, e.g., Foster*, 545 F.3d at 584-85.

infringement.[17]  Nalco reasonably believed the two successive supplementations were more than sufficient.

In dismissing the 4AC, which clearly was decided on the basis of the district court's construction of "flue gas" and "injecting," and setting aside that these decisions were in error, the court should have afforded Nalco the opportunity to plead its *Markman* evidence and argument on the claim construction issue, if the court was going to impose this improperly high pleading standard.  With the pleading of that evidence by Nalco, which Nalco included in its Rule 59(e) motion, there could not have been any doubt that even under the flawed court's standard (which wrongly incorporates claim construction into the Rule 12(b)(6) analysis), that Nalco at least stated a plausible claim that put Chem-Mod on adequate notice of its claims (thereby satisfying Rule 8(a)), and stated a plausible claim for infringement (thereby satisfying Rule 12(b)(6)).

That the district court incorrectly held this view is supported by a statement made in denying Nalco's Rule 59(e) motion: "Nalco offers no explanation as to why so much evidence, which it claims has been in its possession, was not previously incorporated into one version of its prior pleadings." Appx17.  Setting

---

[17] Contrary to both the court, and to Chem-Mod, this clearly is the law. *Hall v. Bed Bath & Beyond, Inc.*, 705 F.3d 1357, 1372 (Fed. Cir. 2013) ("Federal Circuit precedent, the Court's rulings in *Twombly* and *Iqbal*, and Federal Rule 8, make clear that neither claim construction nor prior art is required to be included in the pleadings.").

aside that Nalco has no obligation to include *Markman* evidence and argument in its complaint, this statement by the court highlights the court's error in deciding the Rule 12(b)(6) issue. At least two conclusions can be drawn. First, the district court's admonishment proves that the court viewed claim construction, and evidence pertaining to it, <u>relevant</u> to his dismissal. This is error under *Bill of Lading*. Second, it shows that the court felt that Nalco's evidence did support its positions, and thereby could have affected the court's dismissal decision, which proves the court did understand its decision rested upon a claim construction adverse to Nalco, which plainly is error at the Rule 12(b)(6) stage.[18] Dismissal with prejudice thus was inappropriate.

---

[18] The Seventh Circuit has held that in the context of dismissals pursuant to Rule 12(b)(6), a plaintiff is not barred from identifying factual averments it could make in a future pleading, even after a dismissal has been granted – in fact, such new factual allegations could even be raised for the first time in oral argument on appeal. *See, e.g., Highsmith v. Chrysler Credit Corp.,* 18 F.3d 434, 439-40 (7th Cir. 1994) ("this court has held that when reviewing 12(b)(6) motions, we will consider new factual allegations raised for the first time on appeal provided they are consistent with the complaint .... This rule is necessary to give plaintiffs the benefit of the broad standard for surviving a Rule 12(b)(6) motion.") (citing cases). *Accord Early v. Bankers Life & Casualty Co.*, 959 F.2d 75, 79-80 (7th Cir. 1992); *Orthmann v. Apple River Campground, Inc.*, 757 F.2d 909, 915 (7th Cir. 1985). Thus, any assumption by the district court that Nalco is too late to present evidence supporting its allegations is without merit.

**III. THE DISTRICT COURT ALSO ERRED IN DENYING NALCO'S MOTION FOR RECONSIDERATION UNDER RULE 59(E)**

A motion for reconsideration under Rule 59(e) is permissible when there has been a manifest error of law or fact. *See*, *e.g.*, *Divane v. Krull Elec. Co., Inc.*, 194 F.3d 845, 847 (7th Cir. 1999); *Oto v. Metropolitan Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000). This Court reviews decisions on such motions under an abuse of discretion standard. *Bd. of Trs. Of Bay Med. Ctr.*, 123 F. App'x at 996; *Selective Ins. Co.*, 769 F.3d at 507. A decision that conflicts with the applicable law is an abuse of discretion. *Oto*, 224 F.3d at 606. Here, denying Nalco's Rule 59(e) motion clearly was in conflict with the law.

In its Motion for Reconsideration, Nalco moved for the court to correct its error in making the dismissal "with prejudice." Nalco submitted voluminous evidence, summarized in the Background Section, that proves it is not true that it was "certain" that Nalco could never plead a case that would satisfy Rule 12(b)(6) (even applying the district court's incorrectly high standard).

As noted, the court devoted only <u>one sentence</u> of its opinion to explaining that its dismissal with prejudice was appropriate. The basis given was that Nalco had been afforded several opportunities to re-plead its allegations, and that no manifest error of law had been shown. Appx10. Entirely absent from the analysis was a finding that it was certain Nalco could not in the future present a pleading that states a claim for relief. In fact, as described above, the opinion essentially

acknowledges that Nalco could in the future present evidence that would state a claim for relief, but merely admonishes Nalco for not presenting it sooner. Appx17.

Respectfully, the district court abused its discretion by denying Nalco's Motion for Reconsideration after acknowledging that Nalco has evidence which would assist in drafting a future complaint that will state a claim for relief, and thus recognizing there was evidence that would make a future pleading by Nalco anything but "futile." Accordingly, should this Court determine that the court's dismissal pursuant to Rule 12(b)(6) was proper, Nalco respectfully requests that it still determine the court abused its discretion in denying Nalco's Motion for Reconsideration of the dismissal "with prejudice."[19]

## IV. THE ERROR OF THE DISTRICT COURT IN CONSTRUING THE CLAIMS ALSO INFECTED ITS DISMISSAL ON EQUIVALENTS, INDUCING AND CONTRIBUTORY INFRINGEMENT ISSUES

The district court found that the Chem-Mod process could not infringe because of its own construction of the "flue gas" and "injecting" limitations. This was error, as has been addressed in this brief.

But the court also relied upon its conclusion that the claim language was not

---

[19] Any assertion that Nalco waived its argument that dismissal should have been without prejudice should be rejected. Chem-Mod's own briefings demonstrate that Nalco repeatedly made the argument that dismissal should have been "without prejudice" and that the court should conduct a proper claim construction before deciding infringement. Appx5449, Appx5472-5474.

met to also dismiss the claims of: (1) infringement by equivalence; (2) inducing infringement; and (3) contributory infringement. In the case of infringement under the doctrine of equivalents, the court said a claim element was missing, by which it meant the "injecting ... into said flue gas" element was missing. And, in the case of the indirect infringement claims, the court concluded there was no requisite direct infringement, again because the "injecting ... into the flue gas" element was missing.[20]

With a proper reversal of the district court's erroneous analysis of the infringement allegations under Rule 12(b)(6), the error with respect to these three corollary issues – equivalence, inducing, and contributory infringement – also should be reversed.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the foregoing reasons, Nalco respectfully requests this Court reverse the district court's decision that Nalco failed to state a claim for relief pursuant to Rule 12(b)(6); or, alternatively, reverse the district court's denial of Nalco's Motion for Reconsideration and hold that if dismissal is appropriate because this Court agrees

---

[20] As to inducement, the court may also have based its decision on a conclusion that Nalco failed to plead "intent," but this would be plain error. Appx2120-2130, Appx2134, Appx2142-2144 (¶¶ 41-60; 63-77; 90; 115-116). While the court did not address willfulness allegations in the 4AC, it did earlier dismiss those allegations in the 3AC, on grounds there was no underlying infringement. Thus, on this same basis, the dismissal of the willfulness allegations should be reversed.

that Nalco failed to state a claim for relief, that the dismissal of the 4AC should

have been "without prejudice."

Dated: December 12, 2016    Respectfully submitted,

/s/ *W. Bryan Farney*
W. BRYAN FARNEY
DAVID PAUL SWENSON
CASSANDRA KLINGMAN
FARNEY DANIELS PC
800 South Austin Avenue, Suite 200
Georgetown, Texas 78626
Telephone: (512) 582-2828
Facsimile: (512) 582-2829
BFarney@farneydaniels.com
DSwenson@farneydaniels.com
CKlingman@farneydaniels.com

*Counsel for Plaintiff-Appellant*

# ADDENDUM

# TABLE OF CONTENTS

**JUDGEMENT APPEALED FROM**

Northern District of Illinois District Court Order
      Granting Motion to Dismiss                       Appx1

Northern District of Illinois District Court Memorandum
      Opinion and Order on Motion to Dismiss         Appx2-10

Northern District of Illinois District Court Order
      Denying Motion for Reconsideration            Appx11

Northern District of Illinois District Court Memorandum
      Opinion and Order on Motion for Reconsideration     Appx12-18

**PATENTS AT ISSUE**

U.S. Patent 6,808692                           Appx19-28

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS**

|  |  |  |
|---|---|---|
| | ) | |
| Nalco Company | ) | Case No: 14 C 2510 |
| | ) | |
| v. | ) | Judge: John W. Darrah |
| | ) | |
| Chem-Mod, LLC | ) | |
| | ) | |

**<u>ORDER</u>**

Status hearing and ruling on motion hearing held. For the reasons stated in the attached memorandum opinion and order, For the reasons discussed above, Defendants' Motion to Dismiss [114] is granted. Nalco's Fourth Amended Complaint is dismissed with prejudice. Enter Memorandum Opinion and Order. Civil case closed.

(T:) 00:05

Date:   4/20/16                                         /s/ Judge John W. Darrah

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NALCO COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-cv-2510 |
| | ) | |
| CHEM-MOD, LLC; ARTHUR J. GALLAGHER & CO.; | ) | Judge John W. Darrah |
| GALLAGHER CLEAN ENERGY, LLC; | ) | |
| AJG COAL, INC.; AJG IOWA REFINED COAL LLC; | ) | |
| MANSFIELD REFINED COAL LLC; | ) | |
| COPE REFINED COAL LLC; | ) | |
| CROSS REFINED COAL LLC; | ) | |
| JEFFERIES REFINED COAL LLC; | ) | |
| JOPPA REFINED COAL LLC; | ) | |
| THOMAS HILL REFINED COAL LLC; | ) | |
| WAGNER COALTECH LLC; | ) | |
| WALTER SCOTT REFINED COAL LLC; | ) | |
| WINYAH REFINED COAL LLC; | ) | |
| BEDFORD MIX LLC; | ) | |
| BRANDON SHORES COALTECH LLC; | ) | |
| CANADYS REFINED COAL, LLC; | ) | |
| CORONADO REFINED COAL LLC; | ) | |
| FRM TRONA FUELS LLC; | ) | |
| FRM VIRGINIA FUELS LLC; | ) | |
| GEORGE NEAL NORTH REFINED COAL LLC; | ) | |
| GEORGE NEAL REFINED COAL LLC; | ) | |
| LOUISA REFINED COAL, LLC; | ) | |
| REFINED FUELS OF ILLINOIS, LLC; and | ) | |
| BELLE RIVER FUELS COMPANY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Nalco Company ("Nalco") filed a Fourth Amended Complaint ("4AC") against

Defendants Chem-Mod, LLC ("Chem-Mod"); Arthur J. Gallagher & Co. ("A.J. Gallagher");

Gallagher Clean Energy, LLC ("Gallagher Clean Energy"); AJG Coal, Inc. ("AJG Coal"); and

21 limited liability companies named: AJG Iowa Refined Coal LLC; Mansfield Refined Coal LLC; Cope Refined Coal LLC; Cross Refined Coal LLC; Jefferies Refined Coal LLC; Joppa Refined Coal LLC; Thomas Hill Refined Coal LLC; Wagner Coaltech LLC; Walter Scott Refined Coal LLC; Winyah Refined Coal LLC; Bedford Mix LLC; Brandon Shores Coaltech LLC; Canadys Refined Coal, LLC; Coronado Refined Coal LLC; FRM Trona Fuels LLC; FRM Virginia Fuels LLC; George Neal North Refined Coal LLC; George Neal Refined Coal LLC; Louisa Refined Coal, LLC; Refined Fuels of Illinois, LLC; and Belle River Fuels Company, LLC (collectively "Refined Coal LLCs"). The Complaint alleges patent infringement of United States Patent No. 6,808,692 (the "'692 Patent"), entitled "Enhanced Mercury Control in Coal-Fired Power Plants." Defendants previously moved to dismiss Nalco's First Amended Complaint ("FAC"). On February 4, 2015, Defendants' Motion was granted, and Plaintiff's First Amended Complaint was dismissed without prejudice. On April 24, 2015, Plaintiff filed a Third Amended Complaint ("TAC"). Defendants filed Motions to Dismiss [68, 89] Plaintiff's Third Amended Complaint and on October 15, 2015, Defendants' Motion was granted. Plaintiff's TAC was dismissed without prejudice. On November 16, 2015, Plaintiff filed a 4AC. Defendants filed a Motion to Dismiss [114] Plaintiff's 4AC, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim. For the reasons set forth below, the Motion is granted.

## BACKGROUND

The following is taken from the 4AC, which is assumed to be true for purposes of a motion to dismiss. *See Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010). For a more detailed background of this case, see the Memorandum Opinion and Order dated

2

Appx3

October 15, 2015. Nalco is the exclusive licensee of the '692 Patent, which claims a method to

reduce mercury emission from flue gases evolved during the combustion of coal. The '692

Patent was issued by the United States Patent & Trademark Office ("USPTO") on

October 26, 2004, and reexamined by the USPTO in April, 2014. Claim 1 of the '692 Patent is

directed to: A method of treating coal combustion flue gas containing mercury, comprising:

> injecting a bromide compound that is a thermolabile molecular bromine precursor
> into said flue gas to effect oxidation of elemental mercury to a mercuric bromide
> and providing alkaline solid particles in said flue gas ahead of a particulate
> collection device, in order to absorb at least a portion of said mercuric bromide.

(*See*, e.g., 4AC Exh. A.)

The 4AC alleges that Defendants infringed the '692 Patent through their use, licensing,

sale, and offer of a coal additive system known as "Chem-Mod Solution." Nalco alleges that

Chem-Mod has directly infringed the '692 Patent under 35 U.S.C. § 271 (a) literally or under the

doctrine of equivalents by using, selling, and/or offering to sell the Chem-Mod$^{TM}$ Solution and

the additives MerSorb, and S-Sorb in the United States. Similar to the Third Amended

Complaint ("TAC"), the 4AC asserts claims for direct infringement through Defendants' use of

the Chem-Mod$^{TM}$ Solution and/or through their control and direction of entities that have used

the Chem-Mod$^{TM}$ Solution. (4AC ¶ 22.) The 4AC also alleges that Defendants indirectly

infringe the '692 Patent by actively inducing and contributing to the infringing use of the Chem-

Mod$^{TM}$ Solution by others. (4AC ¶ 23.)

## LEGAL STANDARD

Rule 12(b)(6) permits a defendant to move to dismiss a complaint for "failure to state a

claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to

dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its

3

face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Facial plausibility exists when the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Rather, the complaint must provide a defendant "with 'fair notice' of the claim and its basis." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (quoting Fed. R. Civ. P. 8(a)(2) and *Twombly*, 550 U.S. at 555). When ruling on a motion to dismiss, the court accepts all well-pleaded factual allegations as true and construes all reasonable inferences in favor of the plaintiff. *Tamayo*, 526 F.3d at 1081.

A direct infringement claim that meets or exceeds Form 18 of the Federal Rules of Civil Procedure meets Rule 8's "short and plain statement" requirement. *In re Bill of Lading*, 681 F.3d 1323, 1332 (Fed. Cir. 2014). Form 18 requires:

> (3) a statement that defendant has been infringing the patent 'by making, selling, and using [the device] embodying the patent'; (4) a statement that the plaintiff has given the defendant notice of its infringement; and (5) a demand for an injunction and damages.

*Bill of Lading*, 681 F.3d at 1334.

## ANALYSIS

### *Direct Infringement*

Defendants argue that Nalco has failed to state a claim for direct infringement because the Chem-Mod[TM] Solution is different from the method claimed in the '692 Patent. Defendants further argue that the 4AC fails to allege that any Defendants exercise direction and control over operators of coal-fired power plants or that they formed joint enterprises with operators of coal-

4

fired power plants.  As in its responses to Defendants' previous motions to dismiss, Nalco argues

that Defendants' arguments are a premature attempt at claim construction.

Nalco argues that the claims of the '692 Patent do not restrict whether the step of

"injecting a bromide compound that is a thermolabile molecular bromine precursor into said

[coal combustion] flue gas to effect oxidation of elemental mercury to a mercuric bromide" be

performed by injecting only a thermolabile molecular bromine precursor, or injecting a

thermolabile molecular bromine precursor in combination with other compounds.  (FAC ¶ 19.)

Nalco also argues that during operation of a coal combustion furnace, gases injected via coal

injectors flow under pressure into areas where flue gas exists.  Thus, the MerSorb additive

component of the Chem-Mod Solution Mixture is "injected into . . . coal combustion flue gas."

(FAC ¶ 31.)  As stated in the Memorandum and Order dated October 15, 2015, the Chem-Mod

Solution differs from the '692 Patent in both the location and method of application.  Even

accepting all well pled allegations as true, the 4AC fails to establish a claim for direct

infringement by the use of the Chem-Mod Solution.

Nalco further argues that even if the claims required that the "injecting" occur at a

particular time or location in a coal-fired plant or to require that the "injecting is limited to only a

thermolabile molecular bromine precursor as opposed to a mixture of a thermolabile molecular

bromine precursor mixed with other additives and/or coal, then the Chem-Mod Solution would

nevertheless infringe the claims of the '692 Patent under the doctrine of equivalents.  (FAC

¶ 33.)  "A finding of infringement under the doctrine of equivalents requires a showing that the

difference between the claimed invention and the accused product or method was insubstantial or

that the accused product or method performs the substantially same function in substantially the

same way with substantially the same result as each claim limitation of the patented product or method." *AquaTex Indus. v. Techniche Solutions*, 479 F.3d 1320, 1326 (Fed. Cir. 2007). To find infringement under the doctrine of equivalents, the accused product must contain each limitation of the claim in the patented invention or its equivalent. *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 40 (1997). Nalco fails to provide support that all the steps or the equivalent claim limitations of the '692 Patent are performed. Particularly, the "injection" of the bromide into flue gas. The 4AC does not sufficiently allege that the method in the '692 Patent "performs the substantially same function in substantially the same way with substantially the same result" as the method of the Chem-Mod Solution.

Nalco again argues that Defendants attempt to improperly ask the Court to construe its patent claim at the pleadings stage, stating that, "the Federal Rules of Civil Procedure do not require a plaintiff to plead facts establishing that each element of an asserted claim is met." *Bill of Lading*, 681 F.3d at 1335. However as with Nalco's TAC, "where the facts of record at the pleading stage will so clearly and explicitly indicate that an 'undivided' claim of direct infringement cannot stand — in a manner that could not plausibly be challenged at a later claim construction hearing — that dismissal will be appropriate." *Pragmatus AV, LLC v. Yahoo! Inc.*, CIV.A. 11-902-LPS, 2012 WL 6044793, at *8 (D. Del. Nov. 13, 2012). Nalco fails to establish that the methods of the Chem-Mod Solution directly infringe on the method in the '692 Patent. Therefore, where there are no facts of direct infringement at the pleadings stage, dismissal is proper.

*Divided Infringement*

Even if Nalco could plead that the Chem-Mod Solution does infringe on the '692 Patent,

Defendants argue that Nalco fails to allege that any Defendant is directly responsible for all of

the method steps of the '692 Patent. "Direct infringement under § 271(a) occurs where all steps

of a claimed method are performed by or attributable to a single entity." *Akamai Techs., Inc. v.*

*Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015). "Where more than one actor is

involved in practicing the steps, a court must determine whether the acts of one are attributable

to the other such that a single entity is responsible for the infringement. We will hold an entity

responsible for others' performance of method steps in two sets of circumstances: (1) where that

entity directs or controls others' performance, and (2) where the actors form a joint enterprise."

*Id.*

<u>Directs or Controls</u>

"Liability under § 271(a) can also be found when an alleged infringer conditions

participation in an activity or receipt of a benefit upon performance of a step or steps of a

patented method and establishes the manner or timing of that performance." *Id*. at 1023.

Nalco's 4AC alleges that the Defendants direct and control coal-fired power plants by giving

financial compensation for performing the Chem-Mod Solution. The compensation is either in

the form of lease payments from the Refined Coal LLCs or a reduced price for the purchase of

the Chem-Mod Solution Mixture in comparison to raw coal. The 4AC further alleges that Chem-

Mod and the Refined Coal LLCs establish the manner and timing of the coal-fired power plant's

performance. The basis for these allegations is again based on Defendants' qualification for

Section 45 tax credits and the actions they take in order to qualify.

As stated in the Memorandum and Opinion dated October 15, 2015, "any argument that compliance with Section 45 of the tax code is evidence that Defendants direct and control the infringement of a patent is unpersuasive." An offer to sell coal at a reduced price does not adequately demonstrate control over coal plants. Similarly, instructing power plants on how to use the Chem-Mod Solution Mixture does not show any control over the plants' performance of any alleged infringing method steps. Nalco's claim that Chem-Mod maintains control over power plants is not plausibly supported by the factual allegations in the 4AC.

<u>Joint Enterprise</u>

"A joint enterprise requires proof of four elements: (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *Id.* Nalco's FAC fails to allege facts to support its claim that Defendants partner in a joint enterprise with the operators of coal-fired power plants. The existence of a contract between Refined Coal LLCs and several power plants for purchase of the Chem-Mod Solution Mixture is not sufficient support for the allegation of a joint enterprise. Similarly, there is no showing of equal right of control of this alleged joint enterprise. Nalco claims that the equal right of control rises out of the fact that the power plants can stop using the Chem-Mod Solution and Refined Coal LLCs can stop selling it. This is contradictory to Nalco's argument that Chem-Mod directs and controls the power plants. Therefore, Nalco's claim that Chem-Mod directs and controls the power plants is unsupported by the factual allegations of the 4AC.

8

Appx9

*Indirect Infringement*

To prevail on an inducement claim, a "patentee must establish 'first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 697 (Fed. Cir. 2008). Nalco has not sufficiently pled a claim for direct infringement or intent to cause infringement.

"To establish contributory infringement, the patent owner must show the following elements relevant to this appeal: 1) that there is direct infringement, 2) that the accused infringer had knowledge of the patent, 3) that the component has no substantial noninfringing [*sic*] uses, and 4) that the component is a material part of the invention." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010). Again, as Nalco has not established a claim for direct infringement, it has failed to establish a claim for contributory infringement as well.

Nalco was provided several opportunities to re-plead its allegations but has failed to plead a plausible case of patent infringement. Thus, Nalco's Fourth Amended Complaint is dismissed.

## CONCLUSION

For the reasons discussed above, Defendants' Motion to Dismiss [114] is granted. Nalco's Fourth Amended Complaint is dismissed with prejudice.

Date: _____April 20, 2016_____

_____
JOHN W. DARRAH
United States District Court Judge

9

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS**

|  |  |  |
|---|---|---|
| Nalco Company | ) | Case No: 14 C 2510 |
|  | ) |  |
| v. | ) | Judge: John W. Darrah |
|  | ) |  |
| Chem-Mod, LLC | ) |  |
|  | ) |  |

## <u>ORDER</u>

For the reasons stated in the attached memorandum opinion and order, plaintiff's motion for reconsideration [129] is denied. Enter Memorandum Opinion and Order. Status hearing set for 9/28/16 is vacated.


Date:   9/14/16                                             /s/ Judge John W. Darrah

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NALCO COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-cv-2510 |
| | ) | |
| CHEM-MOD, LLC; ARTHUR J. GALLAGHER & CO.; | ) | Judge John W. Darrah |
| GALLAGHER CLEAN ENERGY, LLC; | ) | |
| AJG COAL, INC.; AJG IOWA REFINED COAL LLC; | ) | |
| MANSFIELD REFINED COAL LLC; | ) | |
| COPE REFINED COAL LLC; | ) | |
| CROSS REFINED COAL LLC; | ) | |
| JEFFERIES REFINED COAL LLC; | ) | |
| JOPPA REFINED COAL LLC; | ) | |
| THOMAS HILL REFINED COAL LLC; | ) | |
| WAGNER COALTECH LLC; | ) | |
| WALTER SCOTT REFINED COAL LLC; | ) | |
| WINYAH REFINED COAL LLC; | ) | |
| BEDFORD MIX LLC; | ) | |
| BRANDON SHORES COALTECH LLC; | ) | |
| CANADYS REFINED COAL, LLC; | ) | |
| CORONADO REFINED COAL LLC; | ) | |
| FRM TRONA FUELS LLC; | ) | |
| FRM VIRGINIA FUELS LLC; | ) | |
| GEORGE NEAL NORTH REFINED COAL LLC; | ) | |
| GEORGE NEAL REFINED COAL LLC; | ) | |
| LOUISA REFINED COAL, LLC; | ) | |
| REFINED FUELS OF ILLINOIS, LLC; and | ) | |
| BELLE RIVER FUELS COMPANY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

On November 16, 2015, Plaintiff Nalco Company ("Nalco") filed a Fourth Amended

Complaint ("4AC") against Defendants Chem-Mod, LLC; Arthur J. Gallagher & Co.;

Gallagher Clean Energy, LLC; AJG Coal, Inc.; and 21 limited-liability companies named:

AJG Iowa Refined Coal LLC; Mansfield Refined Coal LLC; Cope Refined Coal LLC;

Cross Refined Coal LLC; Jefferies Refined Coal LLC; Joppa Refined Coal LLC;

Thomas Hill Refined Coal LLC; Wagner Coaltech LLC; Walter Scott Refined Coal LLC;

Winyah Refined Coal LLC; Bedford Mix LLC; Brandon Shores Coaltech LLC;

Canadys Refined Coal, LLC; Coronado Refined Coal LLC; FRM Trona Fuels LLC;

FRM Virginia Fuels LLC; George Neal North Refined Coal LLC;

George Neal Refined Coal LLC; Louisa Refined Coal, LLC; Refined Fuels of Illinois, LLC; and

Belle River Fuels Company, LLC (collectively, "Defendants"). The 4AC alleges patent

infringement of United States Patent No. 6,808,692 (the "'692 Patent"), entitled "Enhanced

Mercury Control in Coal-Fired Power Plants."

Defendants filed a Motion to Dismiss the 4AC, pursuant to Federal Rule of Civil

Procedure 12(b)(6), for failure to state a claim; and Defendants requested that the 4AC be

dismissed with prejudice. On April 20, 2016, Defendants' Motion was granted, and the 4AC

was dismissed with prejudice. On May 18, 2016, Nalco filed a Motion for Reconsideration [129]

pursuant to Federal Rule of Civil Procedure 59(e). For the reasons set forth below, the Motion is

denied.

## BACKGROUND

Over the course of this litigation, Defendants have moved three times to dismiss Nalco's

pleadings.[1] On February 4, 2015, Defendants' Motion to Dismiss Nalco's First Amended

Complaint was granted, and Nalco's First Amended Complaint was dismissed without prejudice.

---

[1] For a more detailed background of this case, see the Memorandum Opinion and Order
dated February 4, 2015 (Dkt No. 60), and the Memorandum Opinion and Order dated October
15, 2015 (Dkt. No. 107).

On October 15, 2015, Defendants' Motions to Dismiss Nalco's Third Amended Complaint ("TAC") were granted. Nalco's TAC was dismissed without prejudice.

Defendants filed a Motion to Dismiss Nalco's 4AC pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim; and Defendants sought dismissal of the 4AC with prejudice, arguing that Nalco failed to state a claim for direct or indirect infringement because Defendants' Chem-Mod Solution is different from the method claimed in the '692 Patent. On April 20, 2016, Defendants' Motion to Dismiss Nalco's Fourth Amended Complaint was granted, and Nalco's 4AC was dismissed *with* prejudice.

On May 18, 2016, Nalco filed a Motion for Reconsideration [129] pursuant to Federal Rule of Civil Procedure 59(e). For the reasons set forth below, the Motion is denied.

## LEGAL STANDARD

"Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc*., 90 F.3d 1264, 1269 (7th Cir.1996) (internal citation omitted). Under Federal Rule of Civil Procedure 59(e), a motion to alter or amend a judgment is permissible when there is newly discovered evidence or there has been a manifest error of law or fact. *Harrington v. City of Chi.*, 433 F.3d 542, 546 (7th Cir. 2006).

A manifest error of law is the "disregard, misapplication, or failure to recognize controlling precedent," and a manifest error of law is not demonstrated by the disappointment of the losing party. *Oto v. Metro. Life Ins.*, 224 F.3d 601, 606 (7th Cir. 2000) (quoting *Sedrak v. Callahan,* 987 F. Supp. 1063, 1069 (N.D. Ill. 1997)). To succeed on a Rule 59(e) motion, the movant must "clearly establish one of the aforementioned grounds for relief." *Harrington,* 433

F.3d at 546.  "Reconsideration is not appropriate where a party seeks to raise arguments that could have been raised in the original briefing."  *Wiegel v. Stork Craft Mfg., Inc*., 891 F. Supp. 2d 941, 944 (N.D. Ill. 2012).

### ANALYSIS

Nalco's Motion for Reconsideration requests that the Court reconsider its judgment granting Defendants' Motion to Dismiss Nalco's 4AC under Rule 59(e).  Nalco argues that the third ruling dismissing one of Nalco's amended pleadings, the 4AC, should be changed from a dismissal *with* prejudice to a dismissal *without* prejudice.

Nalco contends that in the briefing on the Motion to Dismiss the 4AC, Defendants did not demonstrate that it was "certain" that Nalco could not in the future make a pleading that stated a claim or that any amendment would be futile.  Nalco argues that it should be allowed to re-plead because it could incorporate intrinsic and extrinsic evidence to a "proper" claim construction that would explain the relevant technology and provide a basis for concluding how a person of ordinary skill would understand Claim 1 of the '692 Patent.  Thus, Nalco argues that any dismissal at this stage only should be *without* prejudice.

Defendants correctly point out that Nalco's Motion fails to cite to the standard for Rule 59(e), and Nalco makes no argument in the Motion that it has met the standard such that a Motion to Reconsider would be appropriate.   Nalco eventually states in its Reply brief, at p. 7, that the basis of the Motion is that the Court made a manifest error of law in dismissing the 4AC with prejudice.

Nalco argues that the specification of the '692 Patent supports at least an argument that its claim construction is at least possible because Nalco could incorporate a plethora of intrinsic

and extrinsic evidence that has been in its possession, including expert and inventor testimony, into a future pleading.

Nalco appears to have used this Motion to assert allegations it could have alleged in one of its previously filed pleadings. Further, Nalco uses the Motion to advance arguments in support of its Response to Defendants' Motion to Dismiss – a dispositive motion that has already been granted. As noted in the Order (Dkt. No. 119 at p. 9), the Court accepted all of the allegations in the 4AC as true for purposes of considering the Defendants' Motion to Dismiss. After considering the parties' arguments in the briefing of the Defendants' Motion to Dismiss the 4AC, this Court found that dismissal with prejudice was appropriate because the facts of record at the pleading stage indicated that Nalco failed to establish that the methods of Defendants' Chem-Mod Solution infringed, directly or indirectly, on the method in the '692 Patent.

The 4AC did not sufficiently allege that the method in the '692 Patent "performs the substantially same function in substantially the same way with the substantially same result" as the method of the Chem-Mod Solution because Nalco failed to provide support that all the steps or the equivalent claim limitations of the '692 Patent are performed. The 4AC failed to establish an infringement claim because the Chem-Mod Solution differs from the '692 Patent in both the location and method of application. *See* Order at pp. 5-7 (citing *AquaTex Indus. v. Techniche Solutions*, 479 F.3d 1320, 1326 (7th Cir. 2007); *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17 (1997); *In re Bill of Lading*, 681 F.3d 1323 (Fed. Cir. 2014); *Pragmatus AV, LLC v. Yahoo! Inc.*, CIV.A. 11-902-LPS, 2012 WL 6044793, at *8 (D.Del.Nov. 13, 2012)). Therefore, dismissal was proper; and Nalco's argument that a "manifest

error of law" must be corrected because it is not "certain" that it could not plead an infringement claim is without merit.

Moreover, dismissal of the 4AC with prejudice was appropriate. Nalco failed to plead its patent infringement claims in the 4AC, despite having been provided several opportunities to re-plead its allegations. *See* Dkt. No. 60 (dismissing the Amended Complaint) and 107 (dismissing the Third Amended Complaint.) Because Nalco failed to plead an infringement claim, Defendants' Motion was granted, and the 4AC was dismissed with prejudice. *See Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663 (7th Cir. 2007) (affirming the district court's decision denying plaintiff leave to file a fourth amended complaint). Defendants' Motion to Dismiss specifically sought dismissal of the 4AC with prejudice; and thus, it was appropriate to dismiss the 4AC with prejudice. In addition, Nalco offers no explanation as to why so much evidence, which it claims has been in its possession, was not previously incorporated into one version of its prior pleadings.

Nalco has not met the standard of Rule 59(e) and has not shown a manifest error of law that requires a change in the dismissal of the 4AC. The Order took all of the allegations in the 4AC as true for purposes of ruling on Defendants' Motion to Dismiss the 4AC and found that Nalco failed to allege a claim of direct or indirect infringement. Accordingly, the Court finds that no "manifest error of law or fact" was committed in granting Defendants' Motion to Dismiss the 4AC, and Nalco is not entitled to relief under Rule 59(e).

**<u>CONCLUSION</u>**

For the reasons discussed above, Plaintiff's Motion for Reconsideration [129] is denied.

Date:  9/14/16

JOHN W. DARRAH
United States District Court Judge



US006808692B2

(12) **United States Patent**　　　　　　(10) Patent No.: **US 6,808,692 B2**
Oehr　　　　　　　　　　　　　　　　　　(45) Date of Patent:　　　　**Oct. 26, 2004**

(54) **ENHANCED MERCURY CONTROL IN COAL-FIRED POWER PLANTS**

(76) Inventor: **Klaus H. Oehr**, 1940 180 Street, Surrey, British Columbia (CA), V3S 9V2

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 64 days.

(21) Appl. No.: **10/073,986**

(22) Filed: **Feb. 14, 2002**

(65) **Prior Publication Data**

US 2003/0161771 A1 Aug. 28, 2003

(51) Int. Cl.[7] .................................................. **C01B 9/02**
(52) U.S. Cl. ........................................ **423/210**; 423/491
(58) Field of Search ................................. 423/210, 491

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,729,882 A | 3/1988 | Ide et al. | 423/210 |
| 5,435,980 A | 7/1995 | Felsvang et al. | 423/210 |
| 5,900,042 A | 5/1999 | Mendelsohn et al. | 75/742 |
| 6,136,281 A | 10/2000 | Meischen et al. | 423/210 |
| 6,248,217 B1 | 6/2001 | Biswas et al. | 204/157.4 |
| 6,250,235 B1 | 6/2001 | Oehr et al. | 110/342 |
| 6,328,939 B1 | 12/2001 | Amrhein | 423/210 |
| 6,447,740 B1 | 9/2002 | Caldwell et al. | 423/210 |
| 6,582,497 B1 * | 6/2003 | Maes et al. | 423/210 |
| 6,589,318 B2 * | 7/2003 | El-Shoubary et al. | 423/210 |
| 6,638,485 B1 * | 10/2003 | Iida et al. | 423/210 |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| JP | 63-100918 A | * | 5/1988 | 423/210 |

OTHER PUBLICATIONS

WO 99/58228 published Nov. 18, 1999.*
Chun Wai Lee et al; "Mercury Control Research: Effects of Fly Ash and Flue Gas Parameters on Mercury Speciation", Annual Waste–to–Energy Conference, Proceedings of a Specialty Conference, 6th Miami Beach, FL, United States, May 11–13, 1998, abstract only.*
Singer, Joseph G. editor, 1991. Combustion Fossil Power. Combustion Engineering, Inc. Windsor, Connecticut: pp. 10–4 to 10–14.

www.epa.gov/region02/health/mercury.htm, Feb. 5, 2002.
www.netl.doe.gov/publications/press/2001/tl_mercuryse12.html, Feb. 5, 2002.
Galbreath, Kevin C. and Christopher Zygarlicke. 2000. "Mercury Transformations in Coal Combustion Flue Gas". Fuel Processing Technology. 65–66. 2000. pp. 289–310.
Singer, Joseph G, editor. 1991. Combustion Fossil Power. Combustion Engineering, Inc. Windsor, Connecticut.
Urano, Saburo. 1928. "Studies on Bleaching Powder, VII. The Decomposition of Calcium Hypochlorite by Heat in the Presence of Calcium Chloride". Journal of the Society of Chemical Industry of Japan. vol. 31, pp. 46–52.
Chase, M.W. et al, 1985. "JANAF Thermochemical Tables", Third Edition, Parts I and II, Journal of Physical and Chemical Reference Data, American Chemical Society and the American Institute of Physics for the Natural Bureau of Standards, vol. 14, Supplements I and II.
Senior, C.I. et al. 2000. "Gas–Phase Transformations of Mercury in Coal–Fired Power Plants". Fuel Processing Technology. 63 (2000):197–213.
Lee, Chun Wai; Kilgroe, James D.; and Ghorishi, S. Behrooz. "Mercury Control Research: Effects of Fly Ash and Flue Gas Parameters on Mercury Speciation," U.S. Environmental Protection Agency National Risk Management Research Laboratory and ARCADIS Geraghty & Miller, Inc., Research Triangle Park, NC, no date.

* cited by examiner

*Primary Examiner*—Wayne A. Langel
(74) *Attorney, Agent, or Firm*—Clifford W. Vermette; Vermette & Co.

(57) **ABSTRACT**

A method of treating a coal combustion flue gas, which includes injecting a molecular halogen or thermolabile molecular halogen precursor, such as calcium hypochlorite, able to decompose to form molecular halogen at flue gas temperature. The molecular halogen converts elemental mercury to mercuric halide, which is adsorbable by alkaline solids such as subbituminous or lignite coal ash, alkali fused bituminous coal ash, and dry flue gas desulphurization solids, capturable in whole or part by electrostatic precipitators (ESPs), baghouses (BHs), and fabric filters (FFs), with or without subsequent adsorption by a liquid such as a flue gas desulphurization scrubbing liquor.

**18 Claims, No Drawings**

# ENHANCED MERCURY CONTROL IN COAL-FIRED POWER PLANTS

## FIELD

The present invention relates to a method of reducing the mercury emissions for coal-fired power plants.

## BACKGROUND

The United States Environmental Protection Agency (EPA) in its Utility Air Toxins Report to Congress-February 1998 concluded that "mercury from coal-fired power plants is a serious concern. Power plants account for about 52 tons of annual manmade mercury emissions in the country." The report stated that EPA has been unable to identify any currently feasible, commercially available technology for reducing these emissions. It recommends "further evaluation of potential control strategies" (see www.epa.gov/region2/health/mercury.htm).

The United States Department of Energy (DOE) indicated that it "wants to develop a wider array of mercury control options for power plants that can reliably reduce emissions by 50 to 70% by 2005 and 90% by 2010." (See www.netl.doe.gov/publications/press/2001/tl_mercurysel2.html)

A variety of previous attempts have been made to capture mercury.

Ide et al describe the conversion of mercury into mercuric chloride via addition of acidic chlorine containing material, especially hydrogen chloride, into mercury-containing gaseous emissions (see Ide, Akiro et al. 1988. "Process for Cleaning Mercury-Containing Gaseous Emissions". U.S. Pat. No. 4,729,882). This mercury removal technique requires massive hydrogen chloride injection into mercury containing flue gas, at HCl levels of 500 to 1500 ppm, which would result in excessive corrosion of coal fired power plant steel components. Furthermore, combination of this technique with subsequent hydrogen chloride/mercuric chloride containing flue gas in a wet flue gas desulphurization system (FGD) containing alkali for purposes of sulphur dioxide adsorption from flue gas as a sulphite, bisulphate, bisulphate, or sulphate would result in unacceptable consumption of alkali scrubbing chemicals by the adsorbed hydrogen chloride. Therefore, this technique for mercury control is not believed to be commercially viable in coal-fired power plants.

Felsvang et al describe mercury absorption between 110–170° C. in the presence of chlorides, especially hydrogen chloride and alkaline "basic absorbent" introduced as an aqueous aerosol suspension (Felsvang, K et al. 1995. "Method for Improving the Hg-Removing Capability of a Flue Gas Cleaning Process". U.S. Pat. No. 5,435,980). This technique requires the use of substantial expensive capital equipment foreign to conventional coal fired power plants. It does not utilize existing flue gas desulphurization equipment. Furthermore, alkaline sorbent designed to remove mercuric chloride is partially wasted by hydrogen chloride unreacted with mercury. Finally, its excessive use of hydrogen chloride, especially at 110–170° is certain to cause highly undesirable corrosion of steel containing surfaces in coal-fired power plants due to iron chlorides.

Meichen and Pelt al describe the use of precious metals, especially gold, to catalytically convert elemental mercury Hg° to mercuric chloride HgCl₂ in flue gas (Meischen, S. and J. Van Pelt. 2000. "Method to Control Mercury Emis-

sions from Exhaust Gases". U.S. Pat. No. 6,136,281). This process is limited to oxidation of mercury to mercuric chloride in flue gas below 300° C. due to undesirable loss of gold as volatile gold trichloride. This technique requires the use of substantial expensive capital equipment foreign to conventional coal fired power plants plus the use of very expensive precious metal catalysts.

Biswas and Wu describe the irradiation of solid particles with light, especially ultraviolet light, to induce catalytic photo-oxidation of mercury to forms capable of being adsorbed by solid particles (Biswas, P. and C. Wu. 2001. "Process for the Enhanced Capture of Heavy Metal Emissions". U.S. Pat. No. 6,248,217). Unfortunately, this technique requires the use of substantial expensive capital equipment foreign to conventional coal fired power plants plus the use of consumable metal catalysts.

Amrhein describes the use of existing wet flue gas desulphurization systems to capture oxidized mercury in a manner which inhibits undesirable partial conversion of adsorbed oxidized mercury back to volatile elemental mercury (Amrhein, Gerald T. 2001. "Mercury Removal in Utility Wet Scrubber Using a Chelating Agent". U.S. Pat. No. 6,328,939). The disadvantage of this method is that it requires effective but expensive chelating agents with potential problems due to chelation of scrubber metal components with chelates.

Previous publications have indicated that alkaline fly ash containing solids have an affinity for mercury capture. For instance, Galbreath and Zygarlicke have shown that subbituminous coal ash can capture a portion of mercury in a flue gas (Galbreath, Kevin C. and Christopher Zygarlicke. 2000. "Mercury Transformations in Coal Combustion Flue Gas". Fuel Processing Technology. 65–66, pages 289–310, @ page 304). They also indicated that hydrogen chloride spiking of flue gas inhibited mercury capture by alkaline solids, such as calcium hydroxide or alkaline fly ash by neutralizing the alkaline sites able to complex mercury, especially oxidized mercury. U.S. Pat. No. 6,250,235 issued to Oehr and Yao describes the addition of a fossil fuel and additive in a combustion zone to achieve the following results alone or in combination: accelerated combustion, desulphurization, nitrogen oxides emission reduction, pozzolanic or cementitious products production or combustor anti-fouling (Oehr, Klaus H. and Felix Z. Yao. 2001. "Method and Product for Improved Fossil Fuel Combustion". U.S. Pat. No. 6,250, 235). This is achieved by fusing alkali, such as calcium oxide, to coal ash and sulphur, while the coal is burning, via a flux. Full scale testing of this patented method, using bituminous coal in a 100 megawatt power plant, resulted in 45% reduction of mercury emissions as compared to testing without the use of above fuel additive. X-ray analysis of the resulting fly ash indicated that the normally acidic bituminous fly ash had been converted to an alkaline form containing alkaline cementitious crystals not unlike those found in subbituminous or lignite based fly ash as well as containing small amounts of alkaline calcium oxide and calcium hydroxide.

It is also well known that elemental mercury (Hg°) can be absorbed by activated carbon. Adsorption improves as the temperature of the carbon is reduced or if the carbon is impregnated with halogen species, such as iodine or chlorides and/or sulphides. Unfortunately the use of activated carbon requires extremely high carbon to mercury ratios e.g. 3000–100,000 to 1 carbon to mercury weight ratios. Injection of activated carbon into the cool zones of coal combustors ahead of the ESPs, FFs or BHs, results in unacceptable contamination of coal ash with carbon for purposes of ash recycling into cement/concrete applications.

3

Finally, previous publications have described the capture of mercury in scrubbing solutions containing oxidants. For instance Mendelsohn describes contacting elemental mercury containing flue gas with oxidizing solutions of halogens to effect mercury capture as a mercuric halide (Mendelsohn, M. H. 1999. "Method for the Removal of Elemental Mercury from a Gas Stream". U.S. Pat. No. 5,900,042). This technique is not believed to be commercially viable for any or all of the following reasons:

Mercury capture is inadequate. A maximum of 71.1% and 69.6% mercury removal was demonstrated for bromine and chlorine containing solutions respectively.

Halogen reagents are wasted due to the undesirable consumption of halogen oxidant by sulphur dioxide in the flue gas.

Mercury capture does not utilize existing capital equipment including ESPs, FFs, BHs or FGDs. Expensive additional capital equipment is required. Addition of "bubblers" or liquid scrubbers into a coal-fired power plant would substantially increase pressure drops through the system thereby increasing equipment sizing requirements (e.g. air blowers). This would increase both capital and operating costs for the operation of air blowers.

Mercury capture, with the least expensive chlorine containing solutions, is reduced in the absence of nitric oxide. Clearly NOx removal by technology upstream of the bubbler such as selective catalytic reduction (SCR) or selective non-catalytic reduction (SNCR) would dramatically reduce mercury removal further.

Previous systems for mercury control have been underutilized systems such as electrostatic precipitators (ESPs), wet flue gas desulphurization systems (FGDs), fabric filters (FFs) and baghouses (BHs) for mercury control. Such systems have suffered from a variety of mercury control related problems such as the following:

Injection of excessive levels of acid hydrogen chloride into real or simulated coal combustion flue gas resulting in destruction of alkaline solids able to capture mercury, especially oxidized mercury species such as mercuric chloride, and potential corrosion of metal surfaces such as steel surfaces found in power plants.

Use of excessive levels of expensive supplementary capital equipment and/or chemicals including wet scrubbers, photocatalysts, ultraviolet light generators, precious metals, activated carbon, chelates etc.

Inadequate conversion of mercury to forms, such as mercuric halides for example mercuric chloride, adsorbable by alkaline solids such as alkaline fly ash or alkali fused acidic fly ash to render it alkaline (e.g. bituminous coal fly ash).

SUMMARY OF THE CURRENT INVENTION

The current invention relates to the enhanced capture of mercury in coal combustion systems via enhanced conversion of mercury to mercuric halide species adsorbable by alkaline solids such as fly ash, alkali fused acidic ash (e.g. bituminous ash), dry FGD solids such as calcium oxide, calcium hydroxide or calcium carbonate in ESPs, FFs or BHs in the presence or absence of liquids such as wet FGD scrubber solutions. The current invention further relates to producing mercury containing fly ash, suitable for use in cementitious applications, thereby eliminating undesirable discharge of mercury to landfills from a fly ash source.

According to the invention, there is provided a method of treating coal combustion flue gas, preferably that obtained

4

after the "superheater" section of a coal-fired plant, for example the economizer inlet (Singer, Joseph G editor. 1991. Combustion Fossil Power. Combustion Engineering, Inc. Windsor, Conn., page 5–10), with a source of molecular halogen, such as chlorine gas or a thermolabile alkali metal hypohalite, for example calcium hypochlorite solution able to convert mercury rapidly to mercuric chloride, easily adsorbable by alkaline solids such as subbituminous fly ash, lignite fly ash, alkali fused bituminous fly ash or alkaline dry FGD solids capturable by ESPs, FFs, BHs alone or ahead of a liquid such as a wet FGD scrubbing liquor.

Either molecular halogen such as chlorine gas, and/or bromine gas and/or iodine can be injected, or a molecular halogen precursor such as calcium hypochlorite can be injected into the flue gas. Molecular halogen precursors such as calcium hypochlorite can be used as a whole or partial source of the alkaline solids desirable for oxidized mercury adsorption, e.g. mercuric halide such as mercuric chloride. Molecular halogen precursors containing calcium are particularly desirable in cases where the fly ash or alkali fused fly ash is intended to be used for cementitious applications e.g. in concrete or blended cements.

DETAILED DESCRIPTION

Molecular halogen sources such as chlorine gas, bromine gas or iodine can be used alone or in combination with molecular halogen precursors. Due to cost, chlorine gas is a preferred molecular halogen source.

Non-limiting examples of thermolabile halogen species, able to decompose thermally at flue gas temperatures, typical of coal-fired power plants, are shown in table 1 below:

TABLE 1

| Thermolabile Halogen Precursor | Decomposition Temperature ° C. | Reference |
|---|---|---|
| Calcium hypochlorite | 100 | 12 page 3.23 |
| Magnesium bromide | 165 | 13 page 969 |
| Potassium tri-iodide | 225 | 13 page 1320 |

Urano describes the thermal decomposition of calcium hypochlorite $Ca(OCl)_2$ quantitatively (Urano, Saburo. 1928. "Studies on Bleaching Powder, VII. The Decomposition of Calcium Hypochlorite by Heat in the Presence of Calcium Chloride". Journal of the Society of Chemical Industry of Japan. Volume 31, pages 46–52). He analyzed the products (in solid and gaseous states) after heating mixtures of calcium hypochlorite and calcium chloride $CaCl_2$. The decomposition of calcium hypochlorite in the presence of sufficient calcium chloride was chiefly according to the following reaction:

$$Ca(OCl)_2 + CaCl_2 = 2CaO + 2Cl_2 \qquad (1)$$

and partly to:

$$Ca(OCl)_2 = CaCl_2 + O_2 \qquad (2)$$

The evolution of chlorine was caused by the mutual reaction of calcium hypochlorite with calcium chloride. Molecular bromine can be generated by thermal decomposition of a dehydrated bromide salt solution in the presence of oxygen, for example magnesium bromide solution. Molecular iodine can be generated by thermal decomposition of a dehydrated iodide containing salt solution such as a potassium tri-iodide solution.

The conversion of mercury to its mercuric halide forms is thermodynamically favoured at temperatures typical of coal

combustor flue gas, especially coal combustor flue gas between economizer inlets and ESPs, FGDs, BHs or FFs, as indicated by the negative values for the free energy of formation of mercuric halides, from elemental mercury and molecular halogen, in kilojoules/mole as a function of Celsius temperature as shown in the table 2 below, (Chase, M. W. et al. 1985. "JANAF Thermochemical Tables", third edition, Parts I and II, Journal of Physical and Chemical Reference Data, American Chemical Society and the American Institute of Physics for the Natural Bureau of Standards, Volume 14, Supplements I and II):

TABLE 2

|  | 127° C. | 227° C. | 327° C. | 427° C. | 527° C. |
|---|---|---|---|---|---|
| Mercuric bromide | −140 | −126 | −111 | −91 | −68 |
| Mercuric chloride | −169 | −148 | −137 | −120 | −101 |
| Mercuric iodide | −101 | −92 | −81 | −58 | −35 |

The larger the negative free energy of formation, the more likely the reaction is to proceed. Clearly from table 2, it can be seen that the formation of mercuric chloride from elemental mercury and molecular chlorine is particularly favoured between 127 and 527° C. typical of post-superheater coal combustor flue gas zones. This is fortunate, because the costs of molecular chlorine and molecular chlorine precursors, is lower than their bromine or iodine counterparts.

The following examples illustrate the flexibility of the current invention and a rational, non-limiting basis for controlling mercury emissions via enhanced conversion of mercury to alkali adsorbable mercuric halide, especially mercuric chloride.

EXAMPLE 1

Enhancement of Mercury Capture by Subbituminous Coal Fly Ash

Senior et al have estimated a rate constant k for the $Hg^{\circ}+Cl_2=HgCl_2$ reaction of $1.07*10^{-15}$ cm$^3$ molecule$^{-1}$ second$^{-1}$ at 500° C. for an isothermal plug flow reactor (Senior, C. I. et al. 2000. "Gas-Phase Transformations of Mercury in Coal-Fired Power Plants". Fuel Processing Technology. 63:197–213). The room temperature rate for the same reaction is estimated at $4*10^{-15}$ cm$^3$ molecule$^{-1}$ second$^{-1}$. The activation energy for the reaction was estimated at 3.7 kilojoules/mole.

Galbreath and Zarlicke describe mercury species derived from combustion of subbituminous Absaloka PRB coal (see Galbreath et al., supra). This coal had 50±10 ppm chloride and 0.052±0.005 ppm mercury content with 0.57% sulphur. Absaloka coal combustion flue gas composition was 410 ppmv $SO_2$, 960 ppmv $NO_x$ and 3 ppmv HCl. Baseline flue gas mercury emissions for this coal in $\mu g/m^3$ were 2.28 Hg°, 1.06 HgX$_2$ (includes mercuric chloride), 2.26 Hg particulate and 5.53 mercury total. 100 ppmv HCl spiking of Absaloka coal combustion flue gas resulted in 1.21 HgX$_2$. Senior et al have provided correlations between chloride content of coal, HCl and Cl$_2$ emissions during coal combustion Senior et al., supra. Typically, 1% of the HCl injected converts to Cl$_2$, which means 0.5 ppmv Cl$_2$ would create 0.15 $\mu g/m^3$ HgCl$_2$. Table 3 below illustrates mercury emissions from subbituminous Absaloka coal (Galbreath, supra.). The upper part of the table shows measured mercury emissions derived from combustion of the coal. The bottom part of the table estimates elemental mercury conversion to mercuric chloride using 5 ppmv molecular chlorine injection into flue gas starting at 500° C. Of particular interest is the fact that 40% of the total mercury emission is unoxidized i.e. elemental mercury (2.21/5.53=40%) in the absence of the molecular chlorine spike. Reaction rate k is derived from data discussed previously (see Senior et al., supra.). Note that elemental mercury is estimated at only 2.9% of the baseline case (0.16/5.53=2.9%). Spiking of the flue gas of this subbituminous coal combustion, even at the low molecular chlorine level of 5 ppmv, results in substantial conversion of elemental mercury into the highly desirable, easily adsorbable, mercuric chloride form. Use of a thermolabile molecular chlorine precursor such as a solution of calcium hypochlorite and calcium chloride, able to generate alkaline solids such as calcium oxide CaO, enhances mercury capture in ESPs, FFs and BHs, for all of the reasons cited previously. Clearly, this method of mercury oxidation via molecular halogen sources, such as thermolabile calcium hypochlorite/calcium chloride aqueous mixtures, can be adjusted in numerous advantageous ways e.g. by varying (i) droplet size during injection into flue gas, (ii) concentration of thermolabile species, (iii) dosing level, etc. This technique complements current mercury capturing devices, having an alkaline subbituminous fly ash, including ESPs, FFs or BHs.

TABLE 3

| Absaloka PRB | Baseline |
|---|---|
| Hg total $\mu g/m^3$ | 5.53 |
| Hg as HgX$_2$ $\mu g/m^3$ | 1.06 |
| Hg as particulate $\mu g/m^3$ | 2.26 |
| Hg° $\mu g/m^3$ | 2.21 |
| % Hg elemental | 40.0% |
| | With Cl$_2$ spike |
| Absaloka PRB | At 5 ppmv |
| Hg total $\mu g/m^3$ | 5.53 |
| Hg as HgX2 $\mu g/m^3$ | 3.11 |
| Hg as particulate $\mu g/m^3$ | 2.26 |
| Hg° $\mu g/m^3$ | 0.16 |
| % Hg elemental | 2.9% |
| Ppm Hg total in coal | 0.052 |

| Time seconds | ° F. | ° C. | ° K. | K | Hg° initial molecules/cm$^3$ | Cl$_2$ initial molecules/cm$^3$ | Hg° reacted molecules/cm$^3$ | % Hg° reacted |
|---|---|---|---|---|---|---|---|---|

TABLE 3-continued

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 0.000 | 1000 | 538 | 811 | 1.09E-15 | 6.63E+09 | 1.34E+14 | |
| 0.100 | 964 | 518 | 791 | 1.08E-15 | 5.66E+09 | 1.34E+14 | 9.75E+08 | 15% |
| 0.200 | 928 | 498 | 771 | 1.06E-15 | 4.84E+09 | 1.34E+14 | 8.20E+08 | 27% |
| 0.300 | 892 | 478 | 751 | 1.05E-15 | 4.15E+09 | 1.34E+14 | 6.91E+08 | 37% |
| 0.400 | 856 | 458 | 731 | 1.03E-15 | 3.56E+09 | 1.34E+14 | 5.83E+08 | 46% |
| 0.500 | 820 | 438 | 711 | 1.01E-15 | 3.07E+09 | 1.34E+14 | 4.93E+08 | 54% |
| 0.600 | 784 | 418 | 691 | 9.95E-16 | 2.65E+09 | 1.34E+14 | 4.18E+08 | 60% |
| 0.700 | 748 | 398 | 671 | 9.76E-16 | 2.30E+09 | 1.34E+14 | 3.54E+08 | 65% |
| 0.800 | 712 | 378 | 651 | 9.56E-16 | 2.00E+09 | 1.34E+14 | 3.01E+08 | 70% |
| 0.900 | 676 | 358 | 631 | 9.35E-16 | 1.74E+09 | 1.34E+14 | 2.56E+08 | 74% |
| 1.000 | 640 | 338 | 611 | 9.14E-16 | 1.52E+09 | 1.34E+14 | 2.19E+08 | 77% |
| 1.100 | 604 | 318 | 591 | 8.92E-16 | 1.33E+09 | 1.34E+14 | 1.87E+08 | 80% |
| 1.200 | 568 | 298 | 571 | 8.69E-16 | 1.17E+09 | 1.34E+14 | 1.60E+08 | 82% |
| 1.300 | 532 | 278 | 551 | 8.44E-16 | 1.04E+09 | 1.34E+14 | 1.37E+08 | 84% |
| 1.400 | 496 | 258 | 531 | 8.19E-16 | 9.20E+08 | 1.34E+14 | 1.18E+08 | 86% |
| 1.500 | 460 | 238 | 511 | 7.93E-16 | 8.18E+08 | 1.34E+14 | 1.01E+08 | 88% |
| 1.600 | 424 | 218 | 491 | 7.65E-16 | 7.31E+08 | 1.34E+14 | 8.72E+07 | 89% |
| 1.700 | 388 | 198 | 471 | 7.36E-16 | 6.56E+08 | 1.34E+14 | 7.52E+07 | 90% |
| 1.800 | 352 | 178 | 451 | 7.06E-16 | 5.91E+08 | 1.34E+14 | 6.49E+07 | 91% |
| 1.900 | 316 | 158 | 431 | 6.74E-16 | 5.35E+08 | 1.34E+14 | 5.61E+07 | 92% |
| 2.000 | 280 | 138 | 411 | 6.41E-16 | 4.87E+08 | 1.34E+14 | 4.85E+07 | 93% |

## EXAMPLE 2

### Enhancement of Mercury Capture by a Cementitious Fly Ash Derived from Fusion of Alkali with Bituminous Coal Ash During Combustion

Table 4 below illustrates mercury emissions in lbs/hour as measured after an ESP, in a bituminous coal-fired combustor, with and without the addition of lime plus a lime flux as described in U.S. Pat. No. 6,250,235 (Ochr et al.). In this case the "additive" to coal ash ratio ranged from 0.81–0.85. Lime and flux represented 91% and 9% respectively of the additive formula. X-ray diffraction analysis of the fly ash resulting from the use of the "additive" indicated that the fly ash was cementitious and alkaline.

TABLE 4

| | Average Mercury Emissions by type with and without the Additive in lbs/hour | | | |
|---|---|---|---|---|
| | Particulate | Oxidized | Elemental | Total |
| Baseline Average | 3.15E-05 | 2.13E-03 | 3.93E-03 | 6.28E-03 |
| % Mercury by type | 1 | 34 | 63 | 100 |
| Additive/Ash 0.81–0.85 | 1.55E-05 | 5.72E-04 | 2.86E-03 | 3.45E-03 |
| % Mercury by type | 0 | 17 | 83 | 100 |
| % Mercury drop due to Additive | 51 | 73 | 28 | 45 |

The results in the above table indicate two key factors:

The cementitious alkaline fly ash resulting from the use of the additive is a good sorbent for oxidized mercury, because oxidized mercury emissions were reduced by (2.13–0.57)/2.13=73% due to use of the additive.

The flue gas lacked sufficient molecular halogen to effect substantial oxidation of elemental mercury (i.e. only 28% drop from baseline case).

It is certain that injection of a molecular halogen source, such as calcium hypochlorite/calcium chloride aerosol or chlorine gas, at an appropriate dose, in the economizer/ESP section of this combustor, in similar fashion to Example 1, would effect substantial conversion of elemental mercury to easily adsorbable mercuric halide such as mercuric chloride. For instance, a 97.6% reduction in elemental mercury via its conversion to adsorbable mercuric chloride, in similar fash-

ion to Example 1, without a corresponding increase in particulate and oxidized mercury would result in the following levels of mercury control vs. the baseline case shown in Table 5 below:

TABLE 5

| | Average Mercury Emissions by type with and without the Additive in lbs/hour | | | |
|---|---|---|---|---|
| | Particulate | Oxidized | Elemental | Total |
| Baseline Average | 3.15E-05 | 2.13E-03 | 3.93E-03 | 6.28E-03 |
| % Mercury by type | 1 | 34 | 63 | 100 |
| Additive/Ash 0.81–0.85 | 1.55E-05 | 5.72E-04 | 6.86E-05 | 6.56E-04 |
| % Mercury by type | 2 | 87 | 10 | 100 |
| % Mercury drop due to Additive | 51 | 73 | 98 | 90 |

This 90% reduction in mercury emissions would satisfy EPA requirements without destroying the fly ash recyclability, caused by inappropriate injection of a sorbent such as activated carbon. The value of the U.S. Pat. No. 6,250,235 invention is clearly enhanced via the current invention. The technique described in the current example could also be applied ahead of other solids collection devices such as FFs and BHs.

## EXAMPLE 3

### Enhancement of Mercury Capture from Bituminous Coal Combustion by FGDs

A Canadian power plant burning high sulphur United States bituminous coal and equipped with a wet FGD reported the following mercury emissions at the ESP outlet and wet FGD outlet in $\mu g/m^3$ shown in Table 6 below.

TABLE 6

| Bituminous Coal | Baseline ESP outlet | Baseline FGD outlet |
|---|---|---|
| Hg total $\mu g/m^3$ | 5.40 | 2.00 |
| Hg as $HgX_2$ $\mu g/m^3$ | 4.06 | 0.54 |
| Hg as particulate $\mu g/m^3$ | 0.03 | 0.01 |
| $Hg^\circ$ $\mu g/m^3$ | 1.05 | 1.45 |
| % Hg removal via FGD | | 63% |
| % $HgX_2$ removal via FGD | | 87% |

The data indicates that the FGD reduced mercury emissions 63% versus the ESP alone and reduced oxidized mercury

emissions by 87%. Data indicates that (1.45–1.05)/4.06= 10% of oxidized mercuy input to the FGD was reconverted to elemental mercury. using a similar 5 ppmv molecular $Cl_2$ spike as in analogous fashion to Example 1 above results in the following simulation shown in Table 7 below:

TABLE 7

| Bituminous Coal | Simulated ESP outlet | Simulated FGD outlet |
|---|---|---|
| Hg total $\mu g/m^3$ | 5.40 | 1.24 |
| Hg as $HgX_2$ $\mu g/m^3$ | 5.03 | 0.65 |
| Hg as particulate $\mu g/m^3$ | 0.03 | 0.01 |
| $Hg^\circ$ $\mu g/m^3$ | 0.08 | 0.58* |
| % Hg removal via FGD | | 77% |
| % $HgX_2$ removal via FGD | | 87% |

*assumes 10% of oxidized mercury input to FGD reconverted to elemental mercury.

If elemental mercury formation inside the FGD is prevented using previous methods (e.g. Amrhein, Gerald et al.) then emissions are as shown in Table 8 below:

TABLE 8

| Bituminous Coal | Simulated ESP outlet | Simulated FGD outlet |
|---|---|---|
| Hg total $\mu g/m^3$ | 5.40 | 0.74 |
| Hg as $HgX_2$ $\mu g/m^3$ | 5.03 | 0.65 |
| Hg as particulate $\mu g/m^3$ | 0.03 | 0.01 |
| $Hg^\circ$ $\mu g/m^3$ | 0.08 | 0.08* |
| % Hg removal via FGD | | 86% |
| % $HgX_2$ removal via FGD | | 87% |

*assumes 100% inhibition of oxidized mercury conversion to elemental mercury.

Note that the techniques described above might be used in combination, to further enhance performance. For instance, the lime+flux ash fusion additive described in Example 2 above could be combined with the FGD system in Example 3 above plus the molecular halogen or thermolabile molecular halogen precursor of the current invention. This particular combination should easily achieve the 90% EPA mercury reduction requirement by trapping oxidized mercury in an alkaline fly ash thereby reducing oxidized mercury input to the FGD along with subsequent elemental mercury release. Alternatively, a small amount of subbituminous or lignite coal also capable of creating alkaline fly ash could be blended with bituminous coal to increase oxidized mercury capture in the ESP and subsequently reduce elemental mercury discharge from the FGD with or without techniques such as those described Amrheim, supra.

The above examples show that it is possible to achieve dramatic mercury emission reduction, through appropriate use of conventional installed equipment and techniques in combination with the teachings of the current invention. The above 3 examples are believed capable of achieving highly desirable conversion of elemental mercury to a mercuric halide, especially mercuric chloride, easily captured by existing pollution control devices including ESPs, BHs, FFs and wet or dry FGDs burning a variety of coals.

The above techniques can be used alone or supplemented with other techniques to enhance mercury capture in a cost effective way that eliminates undesirable contamination of fly ash with debris (e.g. activated carbon) rendering it unsuitable for recycling in cementitious applications.

Accordingly, while this invention has been described with reference to illustrative embodiments, this description is not intended to be construed in a limiting sense. Various modifications of the illustrative embodiments, as well as other

embodiments of the invention, will be apparent to persons skilled in the art upon reference to this description. It is therefore contemplated that the appended claims will cover any such modifications or embodiments as fall within the true scope of the invention.

REFERENCES

1. www.epa.gov/region2/health/mercury.htm
2. www.netl.doe.gov/publications/press/2001/tl__mercurysel2.html
3. Ide, Akiro et al. 1988. "Process for Cleaning Mercury-Containing Gaseous Emissions". U.S. Pat. No. 4,729,882. March 8.
4. Felsvang, K et al. 1995. "Method for Improving the Hg-Removing Capability of a Flue Gas Cleaning Process". U.S. Pat. No. 5,435,980. July 25.
5. Meischen, S. and J. Van Pelt. 2000. "Method to Control Mercury Emissions from Exhaust Gases". U.S. Pat. No. 6,136,281. October 24.
6. Biswas, P. and C. Wu. 2001. "Process for the Enhanced Capture of Heavy Metal Emissions". U.S. Pat. No. 6,248, 217. June 19.
7. Amrhein, Gerald T. 2001. "Mercury Removal in Utility Wet Scrubber Using a Chelating Agent". U.S. Pat. No. 6,328,939. December 11.
8. Galbreath, Kevin C. and Christopher Zygarlicke. 2000. "Mercury Transformations in Coal Combustion Flue Gas". Fuel Processing Technology. 65–66. pages 289–310.
9. Oehr, Klaus H. and Felix Z. Yao. 2001. "Method and Product for Improved Fossil Fuel Combustion". U.S. Pat. No. 6,250,235. June 26.
10. Mendelsohn, M. H. 1999. "Method for the Removal of Elemental Mercury from a Gas Stream". U.S. Pat. No. 5,900,042. May 4.
11. Singer, Joseph G editor. 1991. Combustion Fossil Power. Combustion Engineering, Inc. Windsor, Conn.
12. Dean, John A. 1992. Lange's Handbook of Chemistry. McGraw-Hill, Inc. (New York)
13. The Merck Index. 1996. Twelfth Edition. Merck & Co. (New Jersey)
14. Urano, Saburo. 1928. "Studies on Bleaching Powder, VII. The Decomposition of Calcium Hypochlorite by Heat in the Presence of Calcium Chloride". Journal of the Society of Chemical Industry of Japan. Volume 31, pages 46–52.
15. Chase, M. W. et al. 1985. "JANAF Thermochemical Tables", Third Edition, Parts I and II, Journal of Physical and Chemical Reference Data, American Chemical Society and the American Institute of Physics for the Natural Bureau of Standards, Volume 14, Supplements I and II.
16. Senior, C. I. et al. 2000. "Gas-Phase Transformations of Mercury in Coal-Fired Power Plants". Fuel Processing Technology. 63:197–213.

I claim:

1. A method of treating coal combustion flue gas containing mercury, comprising:

injecting a member selected from the group consisting of molecular halogen and a thermolabile molecular halogen precursor into said flue gas to effect oxidation of elemental mercury to a mercuric halide and providing alkaline solid particles in said flue gas ahead of a particulate collection device, in order to adsorb at least a portion of said mercuric halide.

2. The method as claimed in claim 1, wherein said molecular halogen and/or thermolabile molecular halogen precursor contains a member selected from the group consisting of chlorine, bromine and iodine.

3. The method as claimed in claim 2, wherein said thermolabile molecular halogen precursor contains a hypohalite.

**4**. The method as claimed in claim **3**, wherein said hypohalite is a hypochlorite.

**5**. The method as claimed in claim **4**, wherein said hypochlorite is calcium hypochlorite.

**6**. The method as claimed in claim **5**, wherein the calcium hypochlorite is in aqueous solution.

**7**. The method as claimed in claim **6**, wherein calcium chloride is a component of the calcium hypochlorite containing solution.

**8**. A method as claimed in claim **1**, wherein the alkaline solid particles are alkaline coal fly ash particles.

**9**. A method as claimed in claim **8**, wherein the coal fly ash particles are those derived from combustion of subbituminous or lignite coal.

**10**. A method as claimed in claim **1**, wherein the alkaline solid particles are those derived from the fusion of coal ash with alkali and an alkali flux.

**11**. A method as claimed in claim **1**, wherein the alkaline solid particles are those derived from the decomposition of a thermolabile halogen precursor.

**12**. A method as claimed in claim **1**, wherein the alkaline solid particles are those derived from flue gas desulphurization solids.

**13**. The method as claimed in claim **1**, wherein said particulate matter collection device is an electrostatic precipitator.

**14**. The method as claimed in claim **1**, wherein said particulate matter collection device is a baghouse.

**15**. The method as claimed in claim **1**, wherein said particulate matter collection device is a fabric filter.

**16**. The method as claimed in claim **1**, wherein the resulting treated flue gas having had particulate matter removed is passed through a flue gas desulphurization system (FGD) containing a liquid.

**17**. The method as claimed in claim **11**, wherein the alkaline particles contain lime.

**18**. The method as claimed in claim **1**, wherein the mercuric halide containing alkaline solid particles are suitable for use in cementitious products.

* * * * *



US006808692C1

(12) **INTER PARTES REEXAMINATION CERTIFICATE** (852nd)

# United States Patent
Oehr

(10) **Number:** US 6,808,692 C1

(45) **Certificate Issued:** Apr. 7, 2014

(54) **ENHANCED MERCURY CONTROL IN COAL-FIRED POWER PLANTS**

(75) Inventor: **Klaus H. Oehr**, Surrey (CA)

(73) Assignee: **Hazelmere Research Ltd.**, Surrey, British Columbia

**Reexamination Request:**
No. 95/001,368, May 28, 2010

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **6,808,692** |
| Issued: | **Oct. 26, 2004** |
| Appl. No.: | 10/073,986 |
| Filed: | Feb. 14, 2002 |

(51) **Int. Cl.**
*B01D 53/64* (2006.01)
*B01D 53/46* (2006.01)

(52) **U.S. Cl.**
USPC ............................................. **423/210**; 423/491

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 95/001,368, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Alan Diamond

(57) **ABSTRACT**

A method of treating a coal combustion flue gas, which includes injecting a molecular halogen or thermolabile molecular halogen precursor, such as calcium hypochlorite, able to decompose to form molecular halogen at flue gas temperature. The molecular halogen converts elemental mercury to mercuric halide, which is adsorbable by alkaline solids such as subbituminous or lignite coal ash, alkali fused bituminous coal ash, and dry flue gas desulphurization solids, capturable in whole or part by electrostatic precipitators (ESPs), baghouses (BHs), and fabric filters (FFs), with or without subsequent adsorption by a liquid such as a flue gas desulphurization scrubbing liquor.

**1**

# INTER PARTES
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 316

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.

ONLY THOSE PARAGRAPHS OF THE
SPECIFICATION AFFECTED BY AMENDMENT
ARE PRINTED HEREIN.

Column 9, before line 64:

*Statement 1. The invention comprises a method of treating
coal combustion flue gas containing mercury, comprising:
injecting one of molecular halogen and a thermolabile
molecular halogen precursor into said flue gas to effect oxi-
dation of elemental mercury to a mercuric halide and provid-
ing alkaline solid particles in said flue gas ahead of a par-
ticulate collection device, in order to adsorb at least a portion
of said mercuric halide.*

*Statement 2. The method of Statement 1, wherein said
molecular halogen and/or thermolabile molecular halogen
precursor contains a member selected from the group con-
sisting of chlorine, bromine and iodine.*

*Statement 3. The invention comprises the method of State-
ment 2, wherein said thermolabile molecular halogen precur-
sor contains a hypohalite.*

*Statement 4. The invention comprises the method of State-
ment 3, wherein said hypohalite is a hypochlorite.*

*Statement 5. The invention comprises the method of State-
ment 4, wherein said hypochlorite is calcium hypochlorite.*

*Statement 6. The invention comprises the method of State-
ment 5, wherein the calcium hypochlorite is in aqueous solu-
tion.*

*Statement 7. The invention comprises the method of State-
ment 6, wherein calcium chloride is a component of the cal-
cium hypochlorite containing solution.*

*Statement 8. The invention comprises the method of State-
ment 1, wherein the alkaline solid particles are alkaline coal
fly ash particles.*

*Statement 9. The invention comprises the method of State-
ment 8, wherein the coal fly ash particles are those derived
from combustion of subbituminous or lignite coal.*

*Statement 10. The invention comprises the method of State-
ment 1, wherein the alkaline solid particles are those derived
from the fusion of coal ash with alkali and an alkali flux.*

*Statement 11. The invention comprises the method of State-
ment 1, wherein the alkaline solid particles are those derived
from the decomposition of a thermolabile halogen precursor.*

**2**

*Statement 12. The invention comprises the method of State-
ment 1, wherein the alkaline solid particles are those derived
from flue gas desulphurization solids.*

*Statement 13. The invention comprises the method of State-
ment 1, wherein the resulting treated flue gas containing
alkaline solid particles is passed through an electrostatic
precipitator.*

*Statement 14. The invention comprises the method of State-
ment 1, wherein the resulting treated flue gas containing
alkaline solid particles is passed through a baghouse.*

*Statement 15. The invention comprises the method of State-
ment 1, wherein the resulting treated flue gas containing
alkaline solid particles is passed through a fabric filter.*

*Statement 16. The invention comprises the method of State-
ment 1, wherein the resulting treated flue gas is passed
through a flue gas desulphurization system (FGD) containing
a liquid.*

*Statement 17. The invention comprises the method of State-
ment 11, wherein the alkaline particles contain lime.*

*Statement 18. The invention comprises the method of State-
ment 1, wherein the mercuric halide containing alkaline solid
particles are suitable for use in cementitious products.*

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

Claims **2-7** are cancelled.

Claims **1**, **11** and **18** are determined to be patentable as
amended.

Claims **8-10** and **12-17**, dependent on an amended claim,
are determined to be patentable.

New claims **19-29** are added and determined to be
patentable.

1. A method of treating coal combustion flue gas contain-
ing mercury, comprising:
  injecting a [member selected from the group consisting of
    molecular halogen and a] *bromide compound that is a*
    thermolabile molecular [halogen] *bromine* precursor
    into said flue gas to effect oxidation of elemental mer-
    cury to a mercuric [halide] *bromide* and providing alka-
    line solid particles in said flue gas ahead of a particulate
    collection device, in order to adsorb at least a portion of
    said mercuric [halide] *bromide*.

11. A method as claimed in claim 1, wherein the alkaline
solid particles are those derived from the decomposition of [a]
*the* thermolabile molecular [halogen] *bromine* precursor.

18. The method as claimed in claim 1, wherein the mercu-
ric [halide] *bromide* containing alkaline solid particles are
suitable for use in cementitious products.

19. *A method of treating flue gas that contains elemental
mercury, wherein the flue gas is produced during the combus-
tion of coal, said method comprising the steps of:*
  (a) *injecting into the flue gas a bromide compound that is a
    thermolabile molecular bromine precursor selected
    from the group consisting of calcium compounds and
    magnesium compounds, whereby the elemental mercury
    is oxidized to form mercuric bromide; and*
  (b) *providing solid alkaline particles in said flue gas
    upstream of a particulate collection device, whereby at*

least a portion of the mercuric bromide produced at Step (a) is adsorbed by the solid alkaline particles.

20. A method of treating flue gas that contains elemental mercury, wherein the flue gas is produced during the combustion of coal, said method comprising the steps of:

(a) injecting into the flue gas a thermolabile molecular halogen precursor, whereby the elemental mercury is oxidized to form mercuric halide; and

(b) providing solid alkaline particles in said flue gas upstream of a particulate collection device, whereby at least a portion of the mercuric halide produced at Step (a) is adsorbed by the solid alkaline particles;

wherein the thermolabile molecular halogen precursor of Step (a) is magnesium bromide.

21. A method of treating flue gas that contains elemental mercury, wherein the flue gas is produced during the combustion of coal, said method comprising the steps of:

(a) injecting into the flue gas a thermolabile molecular halogen precursor, whereby the elemental mercury is oxidized to form mercuric chloride; and

(b) providing solid alkaline particles in said flue gas upstream of a particulate collection device, whereby at least a portion of the mercuric chloride produced at Step (a) is adsorbed by the solid alkaline particles;

wherein the thermolabile molecular halogen precursor of Step (a) is a hypochlorite;

wherein the hypochlorite is calcium hypochlorite; and

wherein the calcium hypochlorite is in an aqueous solution containing calcium chloride.

22. The method of claim 19 wherein the alkaline solid particles provided at Step (b) are coal fly ash particles.

23. The method of claim 22 wherein the coal comprises at least one of subbituminous coal and lignite coal.

24. The method of claim 19 wherein the alkaline solid particles provided at Step (b) are derived from the fusion of coal ash with alkali and an alkali flux.

25. The method of claim 19 wherein the alkaline solid particles provided at Step (b) are derived from the decomposition of the thermolabile molecular bromine precursor of Step (a).

26. The method of claim 19 wherein the alkaline solid particles provided at Step (b) are derived from flue gas desulphurization (FGD) solids.

27. The method of claim 19, further comprising the step of: incorporating the solid alkaline particles collected at Step (b) into a cementitious product.

28. The method of claim 19, further comprising the step of: passing the flue gas through a flue gas desulphurization system (FGD) containing a liquid.

29. The method of claim 19 wherein the particulate collection device of Step (b) is chosen from the group consisting of: a) electrostatic precipitator; b) baghouse; and c) fabric filter.

* * * * *

## PROOF OF SERVICE

I, W. Bryan Farney, being duly sworn according to law and being over the

age of 18, upon my oath depose and say that:

On December 12, 2016, I electronically filed the foregoing **Plaintiff-**

**Appellant Nalco Company's Appeal Brief** with the Clerk of Court using the

CM/ECF System, which will serve via e-mail notice of such filing to all counsel

registered as CM/ECF users, including any of the following:

|  |  |
|---|---|
| Richard W. Mark | Steven Feldman |
| Joseph Evall | Sherry L. Rollo |
| GIBSON DUNN & CRUTCHER LLP | HAHN LOESER & PARKS, LLP |
| 200 Park Avenue | 125  South Wacker Dr |
| New York, NY 10166 | Suite 2900 |
| RMark@gibsondunn.com | Chicago, IL 60606 |
| JEvall@gibsondunn.com | SFeldman@hahnlaw.com |
|  | SRollo@hahnlaw.com |

Electronic copies will be sent directly to the above counsel at the time paper copies

are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will

be filed with the Court within the time provided in the Court's rules.

December 12, 2016                    /s/*W. Bryan Farney*_____
                                     W. Bryan Farney

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), because it contains 13,996 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b). This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point font.

Dated: December 12, 2016

/s/ W. Bryan Farney
W. Bryan Farney
*Counsel for Plaintiff-Appellant*